**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for Zayat Stables, LLC,
Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 10-

In re:

ZAYAT STABLES, LLC,

               Debtor-in-Possession.

Chapter 11

**AFFIDAVIT OF AHMED ZAYAT IN**
**SUPPORT OF DEBTOR'S "FIRST DAY**
**MOTIONS"**

STATE OF NEW JERSEY   )
                        )SS.
COUNTY OF BERGEN    )

        AHMED ZAYAT, of full age, being duly sworn according to law, upon his oath, deposes

and states:

        1.      I am the sole member and officer of Zayat Stables, LLC, a Delaware limited

liability company and the within debtor and debtor-in-possession (the "Debtor"). I have served

as same since the Debtor's inception in August 2005.

2.      I am fully familiar with the Debtor's operations and business affairs, and am duly authorized to make this Affidavit on the Debtor's behalf.[1]  This Affidavit is intended to assist the Court and other parties-in-interest in understanding the circumstances that compelled the Debtor's Chapter 11 filing and to provide general information about the Debtor and its business operations that are germane to the First Day Motions (as defined below).

## I.     PRELIMINARY STATEMENT

3.      The Debtor, organized in 2005, quickly established itself as one of the premier thoroughbred racing horse stables in the United States.  I am the Debtor's sole member.  I have personally invested in excess of $40 million in the Debtor to develop its business and ensure its success.  In its first few years of operations, the Debtor has achieved extraordinary results, consistently exceeding industry benchmarks that have often taken other stables tens of years to achieve (if at all) and setting records in many categories of thoroughbred racing, ownership and sales.  As explained herein, many of the Debtor's existing horses are entering their highest income producing years over the next two to three years and the Debtor is therefore positioned to achieve continued trend setting results as it enters the next phase of its business.

4.      The Debtor seeks the protection of this Court so that it can continue to operate its business and build on its successes for the benefit of all of its creditors in the face of predatory practices by its primary secured lender, Fifth Third Bank ("Fifth Third"), which itself has

---

[1] The factual statements in this Affidavit are based on my personal knowledge, information supplied to me by others under my supervision, my review of relevant documents, and my experience and knowledge of the Debtor's operations and financial condition.

48051/0001-6246797v9

experienced financial difficulties leading to a federal government bailout of more than $3.2

billion of Troubled Asset Relief Program ("TARP") funds. [2]

5.      Simply put, in reliance upon promises by Fifth Third throughout 2009 to extend

credit premised upon a restructuring of existing indebtedness over an extended period of time,

the Debtor abandoned certain of its business plans (such as cancelling and/or withdrawing sales

of horses) that would have raised sufficient liquidity to keep the Debtor current with Fifth Third

and to operate its business during a depressed economic period.  To add insult to injury, in the

midst of the Debtor attempting to finalize a term sheet generated on September 30, 2009 by Fifth

Third (after continuous negotiations throughout 2009), Fifth Third precipitously filed a lawsuit in

federal court in Kentucky and filed a motion to appoint a receiver.

6.      The Debtor has asserted significant counterclaims against Fifth Third for the

damage to its business and intends to vigorously pursue those claims.  However, it has become

increasingly clear to the Debtor that absent the protection and consideration of this Court, Fifth

Third would continue its scorched earth litigation tactics that can only be intended to put the

Debtor out of business.  The Debtor's franchise is far too valuable to its creditors and the

industry as a whole to permit a single creditor, who has acted improperly in reneging on its

promises, to cause a forfeiture of the Debtor's assets to the detriment of all other creditors and

myself as a $40 million investor.

7.      Tellingly, as it enters Chapter 11, the Debtor has the support of the key players in

its industry, including, without limitation, Keeneland Association, Inc., an approximately $2.4

---

[2] I would have thought that Fifth Third would be utilizing those TARP funds to enter into
reasonable work-out solutions with borrowers like the Debtor that are leaders in their industries.

million secured creditor of the Debtor and the world recognized leading market maker and auctioneer of thoroughbred horses.

8.      The Debtor intends to quickly file a plan of reorganization that will pay claims of creditors over a reasonable period of time as it continues to execute on its sound business plans that have thus far produced stellar racing results and, based on prior performance, will continue to do so.  The irony is that Fifth Third will likely be paid in full on its secured claim to the extent recognized by this Court, despite the fact that it has precipitated this Chapter 11 filing and thereby detrimentally impacted the Debtor and its other creditors and constituencies.

## II.      **INTRODUCTION**

9.      On February 3, 2010 (the "Filing Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of Title 11, the United States Code (the "Bankruptcy Code").  Since the Filing Date, the Debtor has remained in possession of its assets and continued management of its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

10.      The Debtor's executive and administrative offices are located at 401 Hackensack Avenue, Hackensack, New Jersey.  The Debtor employs 4 people at its offices in Hackensack and contracts with several trainers/boarders/caretakers located throughout the United States.

11.      To minimize the potentially disruptive impact the commencement of this Chapter 11 case might have on the Debtor's ability to continue operating, and to facilitate the orderly transition into Chapter 11, the Debtor has requested the Court to consider, on an expedited basis,

48051/0001-6246797v9

the following "first day" motions (collectively, the "First Day Motions"):

    (a)    Motion for an Order: (i) authorizing the Debtor's interim and final use of cash collateral pursuant to 11 U.S.C. §§ 361 and 363 and granting adequate protection; and (ii) scheduling a final hearing pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bank. P. 4001;

    (b)    Motion for an Order: (i) authorizing the Debtor to (A) satisfy, and, to the extent applicable, directing the payroll banks to honor, pre-petition gross salaries, payroll taxes and related employee benefit obligations to the Debtor's employees, and (B) honor, in its discretion, pre-petition sick, vacation and personal days; and (ii) granting related relief;

    (c)    Motion for an Order (a) authorizing the Debtor to maintain certain active bank accounts and continue use of its existing business forms, and (b) approving Debtor's cash management system;

    (d)    Motion for an Order: (a) granting interim relief pursuant to 11 U.S.C. § 366(b); (b) authorizing the payment of adequate assurance for postpetition utility services; (c) fixing a final hearing date to determine the sufficiency of adequate assurance; and (d) granting other related relief; and

    (e)    Motion for an administrative Order establishing procedures for allowance of interim compensation and reimbursement of expenses to professionals.

    12.    The purposes of the First Day Motions include, among other things, to: (a) assist the Debtor in continuing to operate in the ordinary course of business; (b) ease the Debtor's transition into Chapter 11; (c) allow for the efficient and orderly administration of the Debtor's case; and (d) provide the Debtor with a "breathing spell" from aggressive creditor action while the Debtor proposes a plan of reorganization designed to maximize recoveries for its stakeholders.  In addition, the Debtor has filed a Motion for a final Order: (1) approving post-petition financing, (2) providing unsecured administrative expense status pursuant to 11 U.S.C.

48051/0001-6246797v9

§§ 364(b), 503(b)(1) and 507(a)(2), and (3) granting other related relief, to address its liquidity

issues.

### III.    FACTUAL BACKGROUND

#### A.    Ahmed Zayat – the Debtor's Principal

13.    I am an entrepreneur known for turning around distressed companies.  I am best

known for the 1997 privatization of Al Ahram Beverages Company ("ABC") from a monopoly,

government-owned company to a publicly listed company on various stock exchanges, including

London, Cairo and Luxembourg.  As Chairman and CEO of the publicly-held ABC, I turned

ABC into the largest beverage manufacturer and distributor in Egypt and the Middle East and

later sold the company in 2002 to Heineken International in the largest private sale in Egypt's

history.  That sale resulted in a return to investors of over 300% on their investment.

14.    My management capabilities and business achievements have been recognized by

many organizations.  I was the recipient of Meed International's CEO of the year award,

nominated as a finalist for CEO of the year in Euromoney, and chosen by the World Economic

Forum at Davos as a global leader for tomorrow in 2001.  I have been featured in numerous

international publications including *Wall Street Journal*, *New York Times*, *Financial Times*,

*Forbes*, *Fortune* and others.

15.    I am a Member of the Young Presidents Organization.  I also was a member of

the Egyptian-American Business Counsel for President Bush and President Mubarak of Egypt (a

counsel consisting of six businessmen that advised President Bush and President Mubarak on all

48051/0001-6246797v9

business transactions between the United States and Egypt).  I have served on numerous boards

and also was an advisor for Nations for Economic Reform in the Middle East.[3]

**B.**     **The Debtor's Business**

16.     I formed the Debtor in August 2005 and, in less than four years, turned the Debtor

into a leading thoroughbred racehorse owner with approximately 203 horses.  The horse breeding

and racing industry is extremely capital intensive.  In addition, there is a several year period after

capital is invested before a horse racing enterprise realizes the fruits of its initial capital and

business plans.  Ultimately, the value created by any racing stable corresponds to two distinct

cycles in a horse's career.  The first cycle spans from birth through the horse's thoroughbred

training and racing career.  The horse's value during that first cycle is enhanced by its racing

success.  The second cycle of a horse's career spans its breeding productivity, which creates

additional value for the enterprise over a period of ensuing years.

17.     Since its inception, the initial focus of the Debtor's operation has been developing

racing and breeding prospects, while longer-range plans have envisioned acquisition of

companies involved in equine health research and product development as well as the possibility

of racetrack ownership.  I have invested in excess of $40 million in the Debtor and I always have

been committed to developing the Debtor into the gold standard of thoroughbred racing and

ownership.

18.     The Debtor has experienced tremendous success since 2005, including being the

breeder of (a) Pioneerof the Nile, the winner of four consecutive graded stakes and second in the

---

[3] My business successes might be viewed as all the more remarkable considering I was
once a personal debtor in this Court nearly 17 years ago as a result, in part, of some poor
business judgments made by former partners of mine.  My personal bankruptcy case was
captioned, In re Ephriam David Zayat a/k/a Ahmed El-Zayat and Joanne K. Zayat a/k/a Joanne
Kranz a/k/a Joanne El-Zayat, Case No. 93-21454 (WFT).

7

2009 Kentucky Derby, and (b) Zensational, the only race sprinter in the history of American

racing to ever win 3 consecutive grade 1 races and the only horse in 65 years to sweep the

California grade 1 stakes.[4]  In addition, members of the Debtor's "first crop" in 2008 included Z

Humor and Z Fortune, which were 2 of the 20 horses that raced at the 2008 Kentucky Derby.

The Debtor also owns celebrated horses such as (a) Premium Wine, (b) Zee Zee, (c) Eaton's

Gift, (d) JBK, (e) JustBen, and (f) EZ Warrior.

19.     In 2008, the Debtor was the leading thoroughbred owner by earnings, winning

almost $7.4 million including 116 victories.  Also in 2008, the Debtor offered 70 horses,

including racing, broodmare and stallion prospects, during the November Keeneland

Thoroughbred Racing and Sale auction.  Those horses included: (a) Baroness Thatcher, who sold

for $1.8 million (purchased for $130,000), (b) Mushka, who sold for $2.4 million (purchased for

$1.6 million), and (c) J Z Warrior, who sold for $1.125 million (purchased for $280,000).[5]  The

success in achieving sale prices for those assets far above their acquisition prices is indicative of

the Debtor's skill in buying and selling thoroughbreds.

20.     In 2009, the Debtor ranked third in thoroughbred racing at over $6.6 million.  In

2010, the Debtor will offer 10 freshman stallions to stud, more than any other thoroughbred

owner in the United States.

21.     The Debtor has consistently exceeded the industry performance benchmarks for a

thoroughbred owner.  For example, 6% of the Debtor's horses in training have been graded

---

[4] In addition, the Debtor was the 2006 Leading Owner in Del Mar, 2007 Leading Owner
in Saratoga, 2007 Thoroughbred Owners and Breeders Association North Eastern Owner of the
Year, 2007 New York Turf Writer's Owner of the Year, 2007 KTDF Owner of the Year, 2008
Leading Owner in North America, and the 2009 Leading Owner in Hollywood Park.

[5] In addition, in 2007, the Debtor sold Downthedustyroad for $1.5 million (purchased for
$125,000).

48051/0001-6246797v9

stakes winners, which is ten times the industry average according to data from The Jockey Club. In addition, approximately 22% of the Debtor's horses in training have won or placed in stakes races, which is three times the industry average according to data from The Jockey Club.  In addition, the Debtor, through its proprietary horse development program, has positioned itself to become a leader in the industry and become the standard for thoroughbred horse ownership.

22.    The Debtor's financial reporting is on a calendar year basis.  For the year ended December 31, 2009, the Debtor generated total revenue in excess of $21 million.

23.    The Debtor's primary assets consist of its inventory of horses.  As of December 2009, the fair market value of the Debtor's inventory of horses, as appraised at the behest of the Debtor's prepetition lender, Fifth Third, was in excess of $37 million.[6]

24.    As set forth above, the Debtor's business is cyclical in nature, and the value of the Debtor's horses increases as their racing and breeding prospects continue to mature and as the industry anticipates horses being offered at the annual auctions in September and November. Indeed, the Debtor has a large number of two and three year old horses that either are entering, or beginning the prime of, their racing careers.  For example, within the last several months, two of the Debtor's recently turned three year olds, Eskendereya and Macias, won races that are important legs toward qualifying for the Kentucky Derby.

---

[6] Nothing herein shall be deemed an acknowledgment or admission as to the appraisal prepared by Fifth Third.

48051/0001-6246797v9

C.      **The Debtor's Pre-Petition Capital Structure**

      1.      **Fifth Third**

25.      The Debtor is a party to a pre-Filing Date senior secured credit facility (the

"Prepetition Credit Facility") with Fifth Third dated as of August 1, 2007, as amended from time

to time, consisting of seven notes (the "Notes") evidencing seven separate loans as follows:[7]

     (a)      August 1, 2007 Revolving Note – Zayat Stables executed and delivered to Fifth Third a revolving note, effective date August 1, 2007, in the face amount of $10,000,000, with a maturity date of July 31, 2009 (the "August 1, 2007 Note"). The August 1, 2007 Note required Zayat Stables to make quarterly interest payments at prime minus 1.00%.

     (b)      February 25, 2008 Revolving Note – Zayat Stables executed and delivered to Fifth Third a revolving note, effective date February 25, 2008, in the face amount of $2,700,000, with a maturity date of March 1, 2010 (the "February 25, 2008 Note"). The February 25, 2008 Note required Zayat Stables to make quarterly interest payments at Prime minus 1.00%.

     (c)      April 1, 2008 Term Note – Zayat Stables executed and delivered to Fifth Third a term note, effective date April 1, 2008, in the original principal amount of $6,000,000, with a maturity date of March 1, 2012 (the "First April 1, 2008 Note"). The First April 1, 2008 Note required Zayat Stables to make quarterly interest payments at Prime minus 1.00%, plus annual principal payments in the amount of $2,000,000 on the first day of March each year, beginning on March 1, 2010.

     (d)      April 1, 2008 Term Note – Zayat Stables executed and delivered to Fifth Third a term note, effective date April 1, 2008, in the original principal amount of $10,000,000, with a maturity date of December 20, 2011 (the "Second April 1, 2008 Note"). The Second April 1, 2008 Note required Zayat Stables to make quarterly interest payments at Prime minus 1.00%, plus a principal payment in the amount of $1,500,000 on December 20, 2009, and a principal payment in the amount of $2,000,000 on December 20, 2010.

---

[7] The Debtor does not acknowledge the indebtedness to Fifth Third and reserves all of its rights to challenge the validity, extent and priority of the indebtedness and alleged liens of Fifth Third, whether by continued preservation of its Answer and Counterclaim (as defined in paragraph 53 below) or otherwise. In addition, nothing herein shall constitute a finding that Fifth Third has a valid lien on the Debtor's assets.

(e)     April 1, 2008 Term Note – Zayat Stables executed and delivered to Fifth Third a term note, effective date April 1, 2008, in the original principal amount of $3,945,970, with a maturity date of December 15, 2011 (the "Third April 1, 2008 Note"). The Third April 1, 2008 Note required Zayat Stables to make quarterly interest payments at Prime minus 1.00%, plus a principal payment in the amount of $1,000,000 on December 20, 2009, and a principal payment in the amount of $1,500,000 on March 1, 2010.

(f)     September 23, 2008 Term Note – Zayat Stables executed and delivered to Fifth Third a term note, effective date September 23, 2008, in the original principal amount of $3,000,000, and with a maturity date of March 1, 2009 (the "September 23, 2008 Note"). The September 23, 2008 Note required Zayat Stables to make quarterly interest payments at Prime.

(g)     January 14, 2009 Draw Note – Zayat Stables executed and delivered to Fifth Third a draw note, effective date January 14, 2009, in the maximum principal amount of $3,000,000, and with a maturity date of January 1, 2010 (the "January 14, 2009 Note"). The January 14, 2009 Note required Zayat Stables to make quarterly interest payments at the Libor Rate plus 2.75%.

26.     The Prepetition Credit Facility is governed by that certain credit and security agreement dated as of August 1, 2007, as amended on January 14, 2009 (collectively, the "Prepetition Security Agreement"), and made as collateral security for: (a) the Notes; and (b) all other obligations, which include all loans, advances, indebtedness and each and every other obligation or liability of the Debtor and Pioneer of the Nile, Ltd.[8] owed to Fifth Third (as further defined in the Prepetition Security Agreement).

27.     As of December 14, 2009, Fifth Third asserted the amount due under the Prepetition Credit Facility was $34,265,970.00, plus $190,505.11 in accrued interest, attorneys' fees, and other costs of collection.

28.     In accordance with the Prepetition Security Agreement, the Prepetition Credit Facility is secured by:

---

[8] Pioneer of the Nile, Ltd. ("Pioneer") is an entity which I wholly own and which has no assets. Pioneer is a co-guarantor (see below) of the Prepetition Credit Facility.

(a)     all thoroughbred bloodstock and/or stallion shares and/or fractional interest(s) therein, their offspring and young, both born and unborn, and/or fractional interest(s) therein, stallion seasons and shares, and any other interest(s) in any of the above owned by the Debtor and/or Pioneer, however classified, whether now owned or after-acquired, including all substitutions thereof (the "Equine Collateral");

(b)     all policies of insurance maintained on the Equine Collateral and all rights to proceeds thereof and refunds thereunder, whether now owned or after-acquired;

(c)     all accounts, deposit accounts, accounts receivable, notes receivable, chattel paper, general intangibles and rights to payment arising out of or in any way relating to the sale, transfer, or other conveyance of all or any interest in any of the Equine Collateral, whether now owned or after-acquired;

(d)     all racing income, breeder's awards income from sales of stallion seasons and shares and any other income derived from or in any way related to the Equine Collateral, whether now owned or after-acquired;

(e)     all certificates of title, certificates of registration and other evidences of ownership, relating to, or in any way connected with, the Equine Collateral, including without limitation, all Jockey Club Certificates of Registration and all stallion share certificates and stallion syndication agreements, whether now owned or after-acquired;

(f)     the savings account, having the account number 7380700760, held by the Debtor with Fifth Third (the "Fifth Third Control Account") (the Equine Collateral and the Fifth Third Control Account is hereinafter referred to as the "Collateral"); and

(g)     all proceeds and products of the Equine Collateral and the Fifth Third Control Account (the "Proceeds," and together with the Equine Collateral and the Fifth Third Control Account, hereinafter referred to as the "Collateral").

29.     In addition, on or about January 14, 2009, Pioneer and I each executed a guaranty (the "Zayat Guaranty" and the "Pioneer Guaranty"), whereby we agreed to guarantee the payment of all monies due, or which may thereafter become due, to Fifth Third under the Prepetition Credit Facility.  Both of the Zayat Guaranty and Pioneer Guaranty have a liability limit of $38,700,000.00.

30.     Additionally, the Debtor is a party to that certain Deposit Account Control

Agreement (the "Control Account Agreement") with Fifth Third, as depository bank.  Pursuant

to the Control Account Agreement, the Debtor maintains a balance of approximately

$600,000.00 in the Fifth Third Control Account to secure the Notes.

### 2.     Keeneland Association, Inc.

31.     As of the Filing Date, the Debtor also was indebted to Keeneland Association,

Inc. ("Keeneland"), a combination thoroughbred race horse and bloodstock sales company (the

"Keeneland Loan").  The Keeneland Loan was in the aggregate amount of $3,131,500.00 and

relates to the Debtor's purchase of twenty-four (24) horses (the "Keeneland Horses") in

September 2009.

32.     The Keeneland Loan is memorialized by that certain note (the "Keeneland Note")

and security agreement (the "Keeneland Security Agreement") dated as of October 12, 2009.  In

accordance with the Keeneland Security Agreement, the Keeneland Note is secured by the

Keeneland Horses as well as the "proceeds" and "products" from same, as such term is defined

in the Uniform Commercial Code of the State of Kentucky, and as further defined in the

Keeneland Security Agreement.

33.     The Keeneland Loan was reduced to $2,381,500.00 by virtue of a $750,000.00

payment from Sherif El Zayat, my brother, to Keeneland on February 2, 2010.  As consideration

for that payment, Keeneland has agreed to the Debtor's use of its cash collateral and to provide

other support to the Debtor relating to the Keeneland Horses.

### 3.     Other Debt and Equity

34.     As of the Filing Date, the Debtor has approximately $1,200,000.00 of other debt,

which consists primarily of amounts due and owing to trainers, boarders and veterinarians.

Some of those parties may assert statutory and/or common-law lien rights for the amounts due

and owing, and the Debtor reserves all its rights with regard to any such claims.  In addition, as

noted above, I have invested over $40 million in capital to grow the Debtor's business.

### IV.        FACTORS PRECIPITATING THE DEBTOR'S CHAPTER 11 FILING

35.        As set forth in the Answer and Counterclaim, this case was precipitated by the

actions of Fifth Third, which have resulted in a pending dispute involving the tale of "two

banks."  The first and "good bank," transacted through Fifth Third's Lexington Kentucky equine

lending department, originated, expanded, and maintained the Debtor's lending requirements.

As the Debtor, similar to the entire equine industry, began to experience liquidity issues upon the

downturn in the economy, the Lexington Fifth Third bankers made verbal and written assurances

that the Debtor's Prepetition Credit Facility would be restructured and re-amortized in order to

provide the Debtor the time it needed to implement its business model, *i.e.,* to successfully train,

race and then ultimately sell its horses at their economic peak.  After the decision was made by

Fifth Third to exit the equine lending business, a second bank, the "bad bank," appeared.  That

bank, transacting through Fifth Third's "work-out" group in Cincinnati, Ohio, was charged with

transitioning Fifth Third out of equine lending.  In furtherance of that objective, the Cincinnati

Fifth Third "work-out" group has repudiated each and every one of its predecessor's

commitments and assurances to the Debtor and has attempted to impose a lending structure

which would financially ruin the Debtor to the detriment of all other stakeholders.

36.        In an effort to adjust to the difficult environment and to address certain maturing

Fifth Third Notes, the Debtor sought to control expenses and maximize cash flows.  Despite

those measures, the Debtor was required to engage in restructuring discussions with Fifth Third

regarding its outstanding indebtedness.

37.     In the context of those discussions, Fifth Third repeatedly assured the Debtor throughout 2008 and into the first quarter of 2009 that the appropriate documents to restructure, extend and re-amortize the Prepetition Credit Facility were "under way" and would be forthcoming.

38.     In December 2008, Fifth Third agreed to extend $3 million in additional financing to the Debtor, as evidenced by the January 14, 2009 Note that was due and payable on January 1, 2010.  As was the case with prior loans throughout 2008, the Debtor accepted those proceeds with the understanding and expectation that the existing Prepetition Credit Facility would be restructured to allow for payment over several years.

39.     Contrary to Fifth Third's promises and representations, upon which the Debtor relied in securing additional financing from Fifth Third, and upon which I relied in executing the Zayat Guaranty, on March 25, 2009, Fifth Third reneged on its prior agreement and declined to extend the maturity dates of the Notes and, in particular, the August 1, 2007 Note and the September 23, 2008 Note, which matured in July 31, 2009 and March 1, 2009, respectively.

40.     During that time, the Debtor and the equine industry as a whole continued to suffer.  Racetracks implemented purse cuts, reduced their stakes program and cut their racing days.  The gross purses for all races in 2009 declined almost 10% from the prior year.  A correction of pricing in the equine auction marketplace also continued.  Keeneland, the major auction house, experienced gross sales of approximately $400 million in 2009, down over 50% in only two years from $815 million in 2007.

41.     As a result of Fifth Third's refusal to honor its agreement to restructure the Prepetition Credit Facility and the continued declines in the equine industry, the Debtor failed to

48051/0001-6246797v9

satisfy the August 1, 2007 Note and the September 23, 2008 Note on their stated maturity dates
of July 31, 2009 and March 1, 2009, respectively.

42.     In an effort to avoid liability for its failure to honor the restructuring agreement, in
or about April 2009, Fifth Third agreed to reconsider its position and refocus on reaching an
agreement on a restructuring of the Prepetition Credit Facility.  Over the next several months, the
parties continued to negotiate the restructuring and extension agreement.

43.     In May 2009, the Debtor requested a meeting with Fifth Third for purposes of
reaching final resolution on the terms of a restructuring agreement.  Based upon existing cash
flow needs and the Debtor's projected earnings, the Debtor proposed a restructuring of the
existing Prepetition Credit Facility based upon a material principal pay down at the end of 2009
with a 5 year amortization of the remaining indebtedness.  That proposal was presented to Fifth
Third's senior executives, including David Haas, Lauris Turck, Charles Fultes, and Bob Heiple,
at a meeting that occurred at Fifth Third's headquarters in Cincinnati, Ohio on June 29, 2009.

44.     On July 9, 2009, the Debtor received written confirmation from Fifth Third
advising the Debtor that Fifth Third approved the restructuring agreement in accordance with the
terms proposed by the Debtor during the June 29, 2009 meeting (the "July 9th Agreement").

45.     Following the July 9th Agreement, Fifth Third, and more particularly, its "work-
out" group, made a series of decisions throughout the balance of 2009 all in a calculated effort to
exit the equine lending business.  In furtherance of that objective, Fifth Third repudiated each
and every one of its commitments and assurances to the Debtor regarding a restructuring of the
Prepetition Credit Facility and attempted to impose a lending structure that would position the
Debtor for financial ruin.

48051/0001-6246797v9

46.    Despite its promises and representations, on or about August 10, 2009, the Bank indicated that it was not going to honor and implement the July 9th Agreement.

47.    As a result, and in order to ensure sufficient liquidity to continue its business operations, the Debtor continued a process of entering a total of 10 horses in the September 2009 Keeneland yearling auction and 57 horses in the November 2009 Keeneland broodmare auction, including 25 broodmare prospects, 15 foals and 17 racing prospects.[9]  Given the depressed market conditions, the Debtor would have preferred not to sell that volume of inventory until market conditions improved.  The Debtor, nonetheless, was resigned, if necessary, to participate in those auctions to raise the funds needed to bring itself fully current on the Notes that matured in 2009 on the outside chance Fifth Third would again renege on its agreement to restructure, extend and re-amortize the Prepetition Credit Facility.

48.    On or about September 15, 2009, at a meeting in Lexington, Kentucky between Fifth Third's senior work-out officers and the Debtor, Fifth Third advised that it was willing to honor the July 9th Agreement with only the following modifications: (1) the extension would be reduced from 5 years to 3 years; (2) the initial paydown would be reduced from $7 million to $5 million and (3) other terms that would not be materially prejudicial to the Debtor and would not be materially different from those in the July 9th Agreement.

49.    In reliance on Fifth Third's representation and promise that the Prepetition Credit Facility would be restructured based on a $5 million paydown and a 3-year amortization of the remaining balance, with Fifth Third's knowledge and acquiescence, the Debtor: (a) withdrew

---

[9] The September Keeneland yearling auction and the November Keeneland broodmare auction are the largest auctions held each year in the horse racing industry.  The Debtor's participation in those auctions each year is a part of its ongoing business plan to maximize the value of its inventory at the most opportune times and recoup the significant capital investment required to train, race and care for the horses throughout the year.

most of the horses slated for sale at the November 2009 auction, and (b) undertook to borrow approximately $3.1 million from Keeneland to purchase additional horses during the September 2009 auction.

50.     Moreover, in reliance on Fifth Third's continuing promises throughout 2009 that the Prepetition Credit Facility would be restructured, the Debtor in good faith paid a total of $4.3 million toward the $5 million paydown, which was not due until year end 2009.  That $4.3 million came from the sale of Zensational's breeding rights, consistent with the previously existing sharing agreement between the parties regarding such proceeds, and a draw down on the Fifth Third Control Account.

51.     Subsequent to the Debtor's $4.3 million aggregate loan pay down and its withdrawal from the November auction (thereby leaving the Debtor without the sales proceeds necessary to pay down the maturing 2009 Notes in accordance with the schedule as it existed prior to the agreed upon extension), Fifth Third, once again, reneged on its oral and written agreements and promises to restructure the Prepetition Credit Facility.

52.     Notwithstanding Fifth Third's repudiation of the parties' agreement and attempts to re-trade on the prior restructuring terms, the parties continued to exchange proposals. Nevertheless, on December 15, 2009, Fifth Third filed a Complaint (a true copy of which is attached as **Exhibit A**) in the United States District Court for the District of Kentucky – Central Division at Lexington, against the Debtor, Ahmed Zayat and Pioneer of the Nile, Ltd., identified as Case No. 05:09-cv-401-KKC, to collect on the Notes, the Zayat Guaranty and the Pioneer Guaranty, as well as to foreclose on the Collateral and appoint a receiver (the "District Court Action").

53.     Through a host of empty promises and retrading on agreements, and without

regard for the Debtor's rights, Fifth Third, its senior officers and representatives manipulated and

positioned the Debtor for financial ruin.  Consequently, the Debtor filed an Answer and

Counterclaim, as amended (a true copy of which is attached as **Exhibit B**, the "Answer and

Counterclaim"), in the District Court Action for declaratory judgment, damages and other relief

in connection with lender liability claims based on the long-standing pattern of misleading,

deceptive and predatory lending practices perpetrated by Fifth Third.  In addition, the Debtor

filed a Memorandum in Opposition to Fifth Third's Motion to Appoint a Receiver (a true copy of

which is attached as **Exhibit C**), which Motion was pending as of the Filing Date.

54.     Had Fifth Third not communicated to the Debtor its agreement to restructure the

Prepetition Credit Facility as detailed above, the Debtor would have proceeded with its plan to

prepare and sell sufficient horses to comply with the Prepetition Credit Facility then in effect.

Alternatively, had Fifth Third honored the agreement it communicated to the Debtor to extend

the terms of the Notes, the Debtor would have been in compliance with the terms of the

Prepetition Credit Facility as extended.  In either event, but for the misrepresentations and/or

breaches of agreement by Fifth Third, the Debtor would not have been in default on the

Prepetition Credit Facility and this Chapter 11 case would have been unnecessary.

55.     Given the rapid pace at which Fifth Third has moved to appoint a receiver, and its

apparent desire to "fire sale" the horses, the Debtor has been forced to file for Chapter 11

protection to preserve its business as a going concern, protect its assets, and maximize value for

the benefit of all creditors.  The Chapter 11 will provide the Debtor with access to funds through

(a) the use of cash collateral, and (b) debtor-in-possession facility in the amount of $2,450,000

(on an administrative expense priority basis), in order to sustain operations and maximize the

48051/0001-6246797v9

value of the Debtor's assets while seeking to reorganize its business.  Without a Chapter 11 filing, the Debtor would have been subject to insufficient working capital, recurrent liquidity crises, and having to defend against the emergency appointment of a receiver brought on by Fifth Third, seemingly intent on a liquidation of the Debtor to the detriment of all creditors.

48051/0001-6246797v9

## V.    <u>CONCLUSION</u>

56.    The Debtor does not intend to languish in Chapter 11.  Rather, the Debtor intends to quickly file a plan of reorganization that will allow for the restructuring of all of its debts as recognized by this Court and preserve a going concern value for the benefit of the Debtor's stakeholders.

57.    The First Day Orders will enable the Debtor to stabilize and continue its operations in the ordinary course while its seeks to reorganize its business.  Accordingly, the Debtor respectfully requests that the Court enter those Orders.


_/s/  Ahmed Zayat_
AHMED ZAYAT


Subscribed and sworn to before me
this 3rd day of February, 2010


_/s/ Ryan T. Jareck_
Ryan T. Jareck, Esq.
Attorney-at-Law of the State of New Jersey

21

48051/0001-6246797v9