**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Attorneys for Zayat Stables, LLC,
Debtor-in-Possession

| | |
|---|---|
| In re:<br><br>ZAYAT STABLES, LLC,<br><br>               Debtor-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE DONALD H.STECKROTH<br><br>CASE NO. 10-13130 (DHS)<br><br>           Chapter 11 |

---

**SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125
OF THE BANKRUPTCY CODE FOR THE SECOND AMENDED CHAPTER 11 PLAN
OF REORGANIZATION OF ZAYAT STABLES, LLC**

---

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND OVERVIEW ................................................................1
   A.   Introduction................................................................................................1
   B.   Disclaimers.................................................................................................3
   C.   Why You Are Receiving This Document ...................................................5
   D.   Summary of Treatment of Claims and Equity Interests..............................6
   E.   Voting on the Plan ....................................................................................11
   F.   Confirmation of the Plan..........................................................................13

II.   GENERAL INFORMATION ........................................................................14
   A.   Description of The Debtor ........................................................................14
   B.   The Debtor's Capital Structure ................................................................19
   C.   Events Precipitating the Chapter 11 Case ................................................23

III.  THE CHAPTER 11 CASE .............................................................................25
   A.   The Voluntary Petition .............................................................................26
   B.   First Day Orders........................................................................................26
   C.   Consent Order Authorizing the Debtor's Use of Cash Collateral.............28
   D.   Debtor's Retention of Professionals ........................................................28
   E.   Appointment of the Creditors' Committee ...............................................28
   F.   DIP Loan...................................................................................................28
   G.   Claims Process and Bar Dates ..................................................................29
   H.   Other Significant Events ...........................................................................30

IV.   SUMMARY OF THE PLAN OF REORGANIZATION ...............................31
   A.   Overview of Chapter 11............................................................................32
   B.   Classification and Treatment of Claims and Equity Interests....................33
   C.   Means for Implementation and Execution of Plan. ...................................43
   D.   Provisions Governing Distributions..........................................................47
   E.   Procedures for Resolving Disputed, Contingent and Unliquidated
        Claims. ......................................................................................................50
   F.   Treatment of Executory Contracts and Unexpired Leases ........................52
   G.   Conditions to Confirmation and Effectiveness of the Plan........................56
   H.   Retention of Jurisdiction ...........................................................................57
   I.   Releases and Related Provisions................................................................59
   J.   Summary of Other Provisions of the Plan ................................................63

V.    VOTING AND CONFIRMATION PROCEDURES ......................................68
   A.   Voting Instructions...................................................................................68
   B.   Proposed Procedure for Tabulating Votes ................................................69
   C.   Voting Record Date ..................................................................................70
   D.   Confirmation Hearing ...............................................................................71

48051/0001-6285623v9

E.    Additional Information ..........................................................................................72

VI.    REQUIREMENTS FOR CONFIRMATION .......................................................................72
A.    Acceptances Necessary to Confirm Plan ....................................................72
B.    Feasibility of the Plan .................................................................................73
C.    Best Interests Test .......................................................................................75
D.    Liquidation Analysis ..................................................................................76
E.    Application of the "Best Interests Test" to the Liquidation Analysis.........77
F.    Confirmation Without Acceptance of All Impaired Classes: The
"Cramdown" Alternative .............................................................................78
G.    Other Requirements of Section 1129 ..........................................................80

VII.    CERTAIN RISK FACTORS TO BE CONSIDERED ......................................................81
A.    Certain Bankruptcy Considerations ............................................................82
B.    Inherent Uncertainty in Claims Estimation.................................................83
C.    Inherent Uncertainty of Projections ...........................................................83
D.    Operational Risk Factors.............................................................................84
E.    Satisfaction of Conditions to Effective Date ..............................................84
F.    Leverage.......................................................................................................85
G.    Litigation.....................................................................................................86
H.    Certain Tax Considerations.........................................................................86

VIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...................86
A.    General.........................................................................................................86
B.    Certain U.S. Federal Tax Consequences to the Debtor ..............................87
C.    Certain U.S. Federal Tax Consequences to the Holders of Claims and
Equity Interests ...........................................................................................88
D.    Importance of Obtaining Professional Tax Assistance ...............................89

IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
PLAN ...............................................................................................................................90
A.    Liquidation under Chapter 7 or Chapter 11 ...............................................90
B.    Alternative Plan(s) of Reorganization .......................................................91

X.    CONCLUSION AND RECOMMENDATION................................................................92

## TABLE OF APPENDICES

APPENDIX A                     PLAN OF REORGANIZATION

APPENDIX B                     HISTORICAL FINANCIAL INFORMATION

APPENDIX C                     PROJECTIONS

APPENDIX D                     LIQUIDATION ANALYSIS

48051/0001-6285623v9

## I.    <u>INTRODUCTION AND OVERVIEW</u>

Zayat Stables, LLC, ("Zayat Stables" or the "Debtor") submits this disclosure statement

(the "Disclosure Statement") pursuant to Section 1125 of Title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq*., as amended (the "Bankruptcy Code"), for use in the solicitation of votes

(the "Solicitation") on the Plan of Reorganization of Zayat Stables, LLC dated April 16, 2010

(including all exhibits thereto and as may be amended from time to time) (the "Plan").  A copy

of the Plan is attached hereto as **Appendix A**.  Except as otherwise provided herein, capitalized

terms used but not defined in this Disclosure Statement will have the meanings ascribed to them

in the Plan.

### A.    <u>Introduction</u>

On February 3, 2010 (the "Commencement Date"), the Debtor commenced its Chapter 11

Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the

United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  The

Chapter 11 Case is assigned to the Honorable Donald H. Steckroth.  No trustee or examiner has

been appointed in the Chapter 11 Case, and the Debtor has remained in possession of its assets

and the management of its business as a debtor-in-possession in accordance with sections 1107

and 1108 of the Bankruptcy Code.  On March 11, 2010, the Office of the United States Trustee

appointed an Official Committee of Unsecured Creditors in the Chapter 11 Case.

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy

Code, contains information regarding the Plan proposed by the Debtor.  A copy of the Plan

accompanies this Disclosure Statement as **Appendix A**.  This Disclosure Statement is being

distributed to you for the purpose of enabling you to make an informed judgment about whether

to accept or reject the Plan.  The Debtor strongly urges you to review carefully the contents of

this Disclosure Statement and the Plan (including the appendices and exhibits to each) before

making a decision to accept or reject the Plan.

1

On June 8, 2010, the Bankruptcy Court approved this Disclosure Statement as containing "adequate information" in accordance with sections 1125(a)(1) and 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor, typical of holders of Claim or Equity Interests receiving this Disclosure Statement, to make an informed judgment about whether to accept or reject the Plan.  Under section 1125 of the Bankruptcy Code, this approval enabled the Debtor to send you this Disclosure Statement and to solicit your acceptance of the Plan.  However, the Bankruptcy Court's approval of the Disclosure Statement neither constitutes an endorsement of the Plan nor a guaranty of the completeness or accuracy of the information set forth herein.

Your vote on the Plan is important.  Absent acceptance of the Plan, there may be protracted delays, the confirmation of another plan, or a liquidation of the Debtor's assets.  These alternatives may not provide for distribution of as much value to holders of Allowed Claims and Allowed Equity Interests as does the Plan.  Accordingly, if you are entitled to vote, the Debtor urges you to accept the Plan by completing and returning the enclosed ballot no later than July 12, 2010 at 5:00 p.m. prevailing Eastern Time.

**The Bankruptcy Court will consider confirmation of the Plan (the "Confirmation Hearing") on July 15, 2010 at 10:00 a.m., prevailing Eastern Time**.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be filed and served so that they are received on or before July 8, 2010 at 5:00 p.m., prevailing Eastern Time, in the manner described in Article V, Section D of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

48051/0001-6285623v9

## B.   Disclaimers

BY ORDER DATED JUNE 9, 2010, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN. HOWEVER, APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  THE BANKRUPTCY COURT HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR'S BUSINESS OPERATIONS, THE VALUE OF THE DEBTOR'S ASSETS OR THE VALUE OF ANY BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ON THE DECISION TO ACCEPT OR REJECT THE PLAN.  HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT IN ITS ENTIRETY.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL

3

REFLECT ACTUAL OUTCOMES.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE V. OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

ALTHOUGH THE DEBTOR'S MANAGEMENT HAS USED ITS REASONABLE BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, SOME OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND IS BASED UPON AN ANALYSIS OF DATA AVAILABLE AT THE TIME OF THE PREPARATION OF THE PLAN AND THIS DISCLOSURE STATEMENT.  WHILE THE DEBTOR'S MANAGEMENT BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR, THE DEBTOR'S MANAGEMENT IS UNABLE TO REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN AND ATTACHED HERETO IS WITHOUT INACCURACIES.

THESE RISK FACTORS CONTAIN CERTAIN FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING, AMONG OTHERS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND OLD EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

48051/0001-6285623v9

### C.    Why You Are Receiving This Document

The Bankruptcy Code requires that the party proposing a Chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement."

The Bankruptcy Code requires a disclosure statement to contain information of a kind, and in sufficient detail, to enable parties who are affected by the plan to vote intelligently for or against the plan or object to the plan, as the case may be.  The Bankruptcy Court has determined that this Disclosure Statement contains adequate information and may be provided to you to solicit your vote on the Plan.  This Disclosure Statement describes the provisions of the Plan and contains information concerning, among other matters:  (1) the Debtor's prepetition operating and financial history, (2) the need to seek Chapter 11 protection, (3) the significant events that have occurred in the Chapter 11 Case, (4) the Chapter 11 voting procedures and the confirmation process, (5) certain effects of confirmation of the Plan, (6) risk factors associated with the Plan, (7) potential federal income tax consequences and (8) the manner in which distributions will be made under the Plan.

Attached as Appendices to this Disclosure Statement are the following documents:

- Appendix A: Plan of Reorganization;

- Appendix B: Historical Financial Information;

- Appendix C: Projections;

- Appendix D: Liquidation Analysis; and

In addition, a Ballot is enclosed with the Disclosure Statement enabling those Holders of Claims entitled to vote to accept or reject the Plan to cast their vote.

For a complete understanding of the Plan, you should carefully review this Disclosure Statement, the Plan and the exhibits, appendices, and schedules thereto in their entirety.  If any

5

inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling.

> D.      **Summary of Treatment of Claims and Equity Interests**

> > 1.   **Unclassified Claims**

As contemplated by the Bankruptcy Code, the Administrative Expense Claims, Professional Compensation and Reimbursement Claims, Priority Tax Claims and the DIP Loan Claim are not classified under the Plan.  Allowed Administrative Claims are to be paid in full on the Effective Date or as soon thereafter as is practicable.  See Article IV, Section B.1.a. of the Disclosure Statement.  The Debtor's estimate of Allowed Administrative Claims is $750,000, exclusive of the DIP Loan Claim.  Holders of Professional Compensation and Reimbursement Claims who properly file final Fee Applications that are approved by the Bankruptcy Court will be paid by the Reorganized Debtor in full in such amounts as are Allowed by the Bankruptcy Court either (i) seven (7) days after such approval, or as soon thereafter as is practicable or (ii) upon such other terms as may be mutually agreed upon by such holder and the Reorganized Debtor, on and after the Effective Date.  See Article IV, Section B.1.b. of the Disclosure Statement.  The Debtor's estimate of Allowed Professional Compensation and Reimbursement Claims is $500,000.  Each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such Allowed Priority Tax Claim (i) payment in Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the Effective Date, (ii) over a period through the fifth anniversary of the Commencement Date, deferred cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, plus interest on such aggregate amount over such period or (iii) such other treatment as to which the Debtor or the Reorganized Debtor, as the case may be, and such Holder will have agreed upon in writing.  See Article IV, Section B.1.c. of the Disclosure Statement.  The Debtor's estimate of Allowed Priority Tax Claims is $0.  The Allowed DIP Loan Claim in the amount of $2,450,000 will be satisfied in full by the assignment

6

by the DIP Lender to Ahmed Zayat ("Zayat" or "Mr. Zayat") of the DIP Loan, and the

forgiveness by Zayat of the obligation of the Debtor to repay the DIP Loan in partial

consideration for the Reinstatement of the Equity Interests.  <u>See</u> Article IV, Section B.1.d. of the

Disclosure Statement.

### 2.  Classified Claims

The following table summarizes the classes of Claims and Equity Interests under the Plan

(the "Classes" and each a "Class") as well as other Claims, estimated aggregate amounts of

Allowed Claims, the treatment of certain Classes, and the estimated percentage recoveries on

account of estimated Allowed Claims and Allowed Equity Interests.  The estimated percentage

recoveries have been calculated based upon a number of assumptions, including the estimated

amount of Allowed Claims in each Class.

7

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS[1] | TREATMENT | VOTING RIGHTS | EST. % RECOVERY[2] |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | $0 | On or as soon as reasonably practicable after the later of (a) the Effective Date or (b) the Distribution Date immediately following the date on which an Other Priority Claim becomes an Allowed Priority Claim, the Holder of an Allowed Other Priority Claim will receive (i) Cash equal to the amount of such Allowed Other Priority Claim, without interest or (ii) such other treatment as to which the Debtor or the Reorganized Debtor, as the case may be, and such Holder will have agreed upon in writing. | Unimpaired. Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | 100% |

---

[1] The general bar date for filing proofs of Claim in the Debtor's bankruptcy case was June 1, 2010. The Debtor has commenced the process of reviewing the filed proofs of Claim and has determined that based on the Debtor's books and records, certain proofs of Claim are objectionable. The Debtor, however, has not completed its analysis of the proofs of Claim in the Chapter 11 Case prior to the filing of this Disclosure Statement and there can be no assurances of the exact amount of the Allowed Claims at this time. Accordingly, these amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in proofs of claim or otherwise. Therefore, the actual amount of the Allowed Claims may be greater or lower than estimated. The Debtor is aware that D.N.J. LBR 3016-2(a) requires Debtor's counsel to review all proofs of Claim filed as of the bar dates before filing a Disclosure Statement. As stated above, the Debtor has commenced the process of reviewing all proofs of Claim to identify the Claims to which the Debtor may object, but has not completed that process before filing this Disclosure Statement. The Debtor is confident, however, that the amount of its Claims listed on its Schedules are accurate, so that to the extent a proof of Claim differs from the Debtor's Schedules, the Holder of the Claim should expect that the Debtor may object to that Claim.

[2] The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Case. The actual recoveries may be higher or lower than projected depending upon, among other things, the amounts of Claims that are actually Allowed by the Bankruptcy Court.

48051/0001-6285623v9

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS[1] | TREATMENT | VOTING RIGHTS | EST. % RECOVERY[2] |
|---|---|---|---|---|---|
| 2 | Fifth Third Claim | The Fifth Third Claim will be Allowed in the amount determined by the Bankruptcy Court in connection with the Fifth Third Claim Litigation.  As of the Commencement Date, Fifth Third asserted a secured claim in the amount of $34,456,405.00. | The Class 2 Fifth Third Claim will be repaid, restructured and re-amortized in accordance with the Fifth Third Amended Loan Documents in substantially the form attached as Exhibit A to the Plan.  The Holder of the Fifth Third Claim will, in full, final, and complete satisfaction of such Allowed Fifth Third Claim, be paid in Cash one hundred (100%) percent of its Allowed Fifth Third Claim in installments in accordance with the Fifth Third Payment Schedule on the later of (i) the applicable Fifth Third Payment Dates and (ii) the date on which the Fifth Third Claim becomes an Allowed Claim; provided, however, that the Reorganized Debtor is entitled to make Cash payments to Fifth Third on account of the Allowed Fifth Third Claim at any time without penalty.  All Installment Payments of Cash to Fifth Third will be held in the Interest Bearing Escrow Account pending the conclusion of the Fifth Third Claim Litigation. | Impaired. Entitled to vote. | 100% |

9

48051/0001-6285623v9

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS[1] | TREATMENT | VOTING RIGHTS | EST. % RECOVERY[2] |
|---|---|---|---|---|---|
| 3 | Keeneland Claim | $2,381,500.00 | The Holder of the Class 3 Keeneland Claim will, in full, final, and complete satisfaction of such Class 3 Keeneland Claim, be paid in Cash one hundred (100%) percent of its Allowed Keeneland Claim in installments in accordance with the Keeneland Payment Schedule. | Impaired. Entitled to vote. | 100% |
| 4 | Service Provider Claims | $6,095.10[3] | Each Holder of an Allowed Class 4 Service Provider Claim will, in full, final, and complete satisfaction of its Class 4 Service Provider Claim, be paid Cash equal to one hundred (100%) percent of its Allowed Service Provider Claim on or before December 31, 2010. | Impaired. Entitled to vote. | 100% |
| 5 | Other Secured Claims | $0 | Each Holder of an Allowed Other Secured Claim will have its Claim Reinstated on the Effective Date unless the Debtor or the Reorganized Debtor, as the case may be, and the Holder of an Allowed Other Secured Claim have agreed to other treatment in writing.  Prepetition Liens with respect to such Allowed Other Secured Claims will survive the Effective Date and will continue in accordance with contractual or statutory terms until such Allowed Other Secured Claim has been paid in full. | Unimpaired. Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | 100% |

---

[3] Any Allowed Service Provider Claim will reduce dollar for dollar the total amount of the Allowed General Unsecured Claims.

48051/0001-6285623v9

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS[1] | TREATMENT | VOTING RIGHTS | EST. % RECOVERY[2] |
|---|---|---|---|---|---|
| 6 | General Unsecured Claims | $1,200,000.00 | Each Holder of an Allowed Class 6 General Unsecured Claim will, in full, final, and complete satisfaction of its Class 6 General Unsecured Claim, be paid Cash equal to one hundred (100%) percent of its Allowed General Unsecured Claim, without interest, in eight (8) equal quarterly payments beginning on or before December 31, 2010 and ending on September 30, 2012. | Impaired. Entitled to vote. | 100% |
| 7 | Equity Interests in Zayat Stables | N/A | In exchange for forgiving any and all Claims the Holder of the Class 7 Equity Interests has or may have against the Debtor and its Estate, including (i) any General Unsecured Claim held by the Holder of the Class 7 Equity Interests as assignee of the Sherif Claim and (ii) any Administrative Expense Claim held by the Holder of the Class 7 Equity Interests as assignee of the DIP Loan, on the Effective Date, the Holder of the Class 7 Equity Interests will have such Equity Interests Reinstated in full. | Unimpaired. Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | 100% |

### E.    Voting on the Plan

#### 1.  Who May Vote

The Plan divides Allowed Claims and Equity Interests into multiple classes.  Pursuant to

the provisions of the Bankruptcy Code, only classes that (a) are "impaired" by a plan of

reorganization and (b) entitled to receive a distribution under such plan are entitled to vote.  A

class is impaired if the legal, equitable, or contractual rights attaching to the Claims or Equity

Interests of the class are modified, other than by curing defaults and reinstating maturities.  *See*

11 U.S.C. § 1124.

11

Under the Plan, only Holders of Claims in Class 2 (Fifth Third Claim), Class 3 (Keeneland Claim), Class 4 (Service Provider Claims) and Class 6 (General Unsecured Claims) (collectively, the "Voting Classes") are entitled to vote on the Plan.  Claims in other Classes are Unimpaired and their holders are deemed to have accepted the Plan.

Holders of Claims in the Voting Classes may vote on the Plan only if they are holders as of June 9, 2010 (the "Voting Record Date").

## 2.    How to Vote

A form of Ballot is being provided to the members of the Voting Classes by which Holders of Claims in such Classes may vote to either accept or reject the Plan.  To vote on the Plan, please carefully review the instructions and complete the enclosed Ballot by (1) indicating that you either accept or reject the Plan and (2) signing your name and mailing the Ballot in the envelope provided for this purpose.  Further details on how to vote are found in Article V.A. of this Disclosure Statement.

The Debtor's counsel will process and tabulate the Ballots and will certify the results to the Bankruptcy Court.  The Debtor's counsel will answer general questions, provide additional copies of all materials, but will not provide specific legal advice concerning your Claim.  Subject to this limitation, you may contact Debtor's counsel at (201) 489-3000.

48051/0001-6285623v9

TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, SIGNED, AND MAILED SO AS TO BE RECEIVED BY DEBTOR'S COUNSEL BY 5:00 P.M. (PREVAILING EASTERN TIME) ON JULY 12, 2010 (THE "VOTING DEADLINE") AT THE FOLLOWING ADDRESS:

> Zayat Stables, LLC Ballot Processing
> c/o Cole, Schotz, Meisel, Forman & Leonard, P.A.
> Attn: Ryan T. Jareck
> Court Plaza North
> 25 Main Street
> Hackensack, NJ 07601

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED, AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED.  IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY SENDING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE.

### F.    Confirmation of the Plan

Holders of Claims in the Voting Classes will have accepted the Plan if (i) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in each such Class have voted to accept the Plan.  **Assuming the requisite acceptances are obtained, the Debtor intends to seek confirmation of the Plan at the Confirmation Hearing scheduled for July 15, 2010, at 10:00 a.m., including confirmation with respect to any rejecting Class under section 1129(b) of the Bankruptcy Code.**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.  If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

Any objections to confirmation of the Plan must be in writing and must be filed with the Bankruptcy Court and served on Debtor's counsel on or before July 8, 2010 at 5:00 p.m. (Prevailing Eastern Time).

48051/0001-6285623v9

## II.    GENERAL INFORMATION

### A.    Description of The Debtor

#### 1.    Business and History of the Debtor

The Debtor was formed in August 2005 by Mr. Zayat.  In less than four years, the Debtor is now a leading thoroughbred racehorse owner with approximately 203 horses as of the Commencement Date.  The initial focus of the Debtor's operation since its inception in 2005 has been developing racing and breeding prospects, with long-range plans to acquire companies involved in equine health research and product development as well as the possibility of racetrack ownership.

Owning, racing and breeding thoroughbred horses is extremely capital intensive and often takes several years for a company to experience returns on its investment as the pedigree and racing record of the inventory of horses matures.  The value of a thoroughbred is derived from its breeding value, which is influenced by several factors including (a) pedigree, (b) racing record, (c) confirmation and (d) market conditions.  The breeding value of a horse increases dramatically each time a horse wins or places in a listed or graded stakes race.  The racing phase of a thoroughbred's lifecycle is akin to growth stocks in that the appreciation in value with each win significantly outpaces the dividends or purse winnings.  Once a successful thoroughbred enters the breeding phase of its lifecycle, it produces a significant amount of cash flow from stud fees.

The Debtor has experienced tremendous success since 2005, including being the breeder of (a) Pioneerof the Nile, the winner of four consecutive graded stakes and second in the 2009 Kentucky Derby, and (b) Zensational, the only race sprinter in the history of American racing to ever win 3 consecutive grade 1 races and the only horse in 65 years to sweep the California grade

14

1 stakes.[4]  In addition, members of the Debtor's "first crop" in 2008 included Z Humor and Z

Fortune, which were 2 of the 20 horses that raced at the 2008 Kentucky Derby.  The Debtor also

owns or owned celebrated horses such as (a) Thorn Song (grade 1); (b) Point Ashley (grade 1);

(c) Zensational (grade 1); (d) Pioneerof the Nile (grade 1); (e) Mushka (grade 1); (f) Eaton's Gift

(grade 2); (g) J Be K (grade 2) and (h) EZ Warrior (multiple grade 3).

In 2008, the Debtor was the leading thoroughbred owner by earnings, winning almost

$7.4 million including 116 victories.  Also in 2008, the Debtor offered 70 horses, including

racing, broodmare and stallion prospects, during the November Keeneland Thoroughbred Racing

and Sale auction.  Those horses included: (a) Baroness Thatcher, who sold for $1.8 million

(purchased for $130,000), (b) Mushka, who sold for $2.4 million (purchased for $1.6 million),

(c) J Z Warrior, who sold for $1.125 million (purchased for $280,000), and (d)

Downthedustyroad, who sold for $1.5 million (purchased for $125,000).  The success in

achieving sale prices for those assets far above their acquisition prices is indicative of the

Debtor's skill in buying and selling thoroughbreds.

In 2009, the Debtor ranked third in thoroughbred racing at over $6.6 million.  In 2010,

the Debtor will offer 13 stallions to stud of which 8 are first-year stallions, including Zensational

(which stands at $25,000) and Pioneerof the Nile (which stands at $20,000), more than any other

thoroughbred owner in the United States.

The Debtor has consistently exceed the averages for a thoroughbred owner.  For example,

6% of the Debtor's horses in training have been graded stakes winners, which is ten times the

industry average according to data from The Jockey Club.  Also, the Debtor's ordinary stakes

---

[4] In addition, the Debtor was the 2006 Leading Owner in Del Mar, 2007 Leading Owner
in Saratoga, 2007 Thoroughbred Owners and Breeders Association North Eastern Owner of the
Year, 2007 New York Turf Writer's Owner of the Year, 2007 KTDF Owner of the Year, 2008
Leading Owner in North America, and the 2009 Leading Owner in Hollywood Park.

15

winning percentage has been 21.5% versus the industry average of 5% to 10%. In addition, approximately 22% of the Debtor's horses in training have won or placed in stakes races, which is three times the industry average according to data from The Jockey Club. In addition, the Debtor, through its proprietary horse development program, has positioned itself to dominate the industry and become the standard for thoroughbred horse ownership.

The Debtor's primary assets consist of its inventory of horses. As of December 2009, the fair market value of the Debtor's inventory of horses, as appraised at the behest of the Debtor's prepetition lender, Fifth Third, was in excess of $37 million. [5]

The Debtor's business is cyclical in nature, and the value of the Debtor's horses increases as their racing and breeding prospects continue to mature and as the industry anticipates horses being offered at the annual yearling auction in September and the annual broodmare and breeding stock auction in November. The substantial capital investments made at the inception of the company's venture have continued to bear fruit and, most recently, in the form of a flourishing three-year old thoroughbred named Eskendereya, a magnificent colt and royally-bred son of Giant's Causeway. At the February 20, 2010, Fasig-Tipton Fountain of Youth Stakes race at Gulfstream Park, a key preparation race for the Kentucky Derby, Eskendereya walloped the highly regarded Jackson Bend and Buddy's Saint while turning in a breakout performance in the Grade 2, $250,000 race. Eskendereya's 8 1/2-length Fountain of Youth Stakes victory has made him an early favorite in the Kentucky Derby's Run for the Roses on May 1, 2010.

Most recently, on April 3, 2010, on his final preparation for the Kentucky Derby, Eskendereya won the prestigious Wood Memorial at the Aqueduct Racetrack, another key preparation race for the Kentucky Derby. In that race, Eskendereya beat out highly regarded

---

[5] Nothing herein shall be deemed an acknowledgment or admission as to the appraisal prepared by Fifth Third.

Jackson Bend and Awesome Act to win the Grade 1, $750,000 race by 9 3/4 lengths.  Based on

the results of all previous three-year-old graded stakes races, Eskendereya is truly a stand out as

the fastest colt in the country at 109 Beyer and an early favorite at the Kentucky Derby.

Eskendereya was unable to compete in the Kentucky Derby due to an injury.

On or about May 10, 2010, the Debtor sold an interest in Eskendereya to Stonestreet

Thoroughbred Holdings, LLC, whose principal is Jess Jackson, founder of Kendall-Jackson

Wine Companies, owner of Horse of the Year and Preakness Winner Curlin and Horse of the

Year Rachel Alexandra (the "Eskendereya Sale").  As part of the Eskendereya Sale, the Debtor

retained certain breeding rights in and to Eskendereya.  The Debtor placed the proceeds from the

Eskendereya Sale in the Interest Bearing Escrow Account in accordance with the Cash Collateral

Order.[6]

## 2.  Organizational Structure

The Debtor is a member-managed limited liability company, organized and existing

under the laws of the State of Delaware.  The sole member and officer of the Debtor is Mr.

Zayat.

## 3.  The Debtor's Operations and Management

The Debtor maintains its office at 401 Hackensack Avenue, Seventh Floor, Hackensack,

New Jersey, 07601.  The Debtor employs four (4) people at its offices in Hackensack and hires

approximately fifty (50) trainers, boarders, caretakers at a given time, who reside throughout the

United States.

---

[6] The Debtor's ability to disclose further details of the Eskendereya Sale is limited by a
confidentiality provision in the purchase agreement, which provides that the Debtor and
Stonestreet Thoroughbred Holdings, LLC shall maintain in confidence the terms and conditions
of the Eskendereya Sale.

48051/0001-6285623v9

The Debtor's management consists of Mr. Zayat, the operating manager, and Mr. Bradley Weisbord, the racing, stallion and financial manager.  As the operating manager, Mr. Zayat is responsible for the day-to-day oversight of the business operations.  As the racing and stallion manager, Mr. Weisbord is responsible for finance issues, sales, the coordination of the races, breeding and overseeing the trainers, boarders and caretakers for the horses.

Mr. Zayat brings substantial management experience and achievements to the Debtor.  In 1997, he privatized the Al Ahram Beverages Company ("ABC") from a monopoly, government-owned company to a publicly listed company on various stock exchanges, including London, Cairo and Luxembourg.  As Chairman and CEO of the publicly-held ABC, Mr. Zayat turned ABC into the largest beverage manufacturer and distributor in Egypt and the Middle East and later sold the company in 2002 to Heineken International in the largest private sale in Egypt's history.  That sale resulted in a return to investors of over 300% on their investment.

Mr Zayat's management capabilities and business achievements have been recognized by many organizations.  He was the recipient of Meed International's CEO of the year award, nominated as a finalist for CEO of the year in Euromoney, and chosen by the World Economic Forum at Davos as a global leader for tomorrow in 2001.  Mr. Zayat has been featured in numerous international publications including *The Wall Street Journal*, *The New York Times*, *The Financial Times*, *Forbes*, *Fortune* and others.  He is a member of the Young Presidents Organization, and was a former member of the Egyptian-American Business Counsel for President Bush and President Mubarak of Egypt (a counsel consisting of six businessmen that advised President Bush and President Mubarak on all business transactions between the United States and Egypt).  Mr. Zayat has also served on numerous boards and also was an advisor for Nations for Economic Reform in the Middle East.  Mr. Zayat personally invested in excess of $40 million in the Debtor to develop its business and ensure its success.

48051/0001-6285623v9

### 4.  Historical Financial Information

The Debtor's Historical Financial Information is attached as **Appendix B** to this

Disclosure Statement.  The Debtor reports for financial purposes on a calendar year basis.  The

Debtor's revenues for the last two calendar years have been as follows: $21.3 million in 2009,

and $19.3 million in 2008.  The Debtor's net loss for the last two calendar years have been as

follows: $8.8 million in 2009 and $20.7 million in 2008.

### B.        The Debtor's Capital Structure

The Debtor's principal capital structure consists of secured debt, unsecured debt and

equity interests.  As of the Commencement Date, the Debtor had approximately $40 million of

indebtedness.  The Debtor's principal indebtedness is comprised of: (a) a Prepetition Credit

Facility with Fifth Third; (b) the Keeneland Loan, (c) the Service Provider Secured Claims and

(d) Unsecured Debt (all as defined below).

### 1.  Prepetition Credit Facility

The Debtor is a party to a pre-Commencement Date senior secured credit facility (the

"Prepetition Credit Facility") with Fifth Third Bank ("Fifth Third") dated as of August 1, 2007,

as amended from time to time, consisting of seven notes (the "Notes") evidencing seven separate

loans as follows:

> (a)    August 1, 2007 Revolving Note – Zayat Stables executed and delivered to Fifth Third a revolving note, effective date August 1, 2007, in the face amount of $10,000,000, with a maturity date of July 31, 2009 (the "August 1, 2007 Note").  The August 1, 2007 Note required Zayat Stables to make quarterly interest payments at prime minus 1.00%.

> (b)    February 25, 2008 Revolving Note – Zayat Stables executed and delivered to Fifth Third a revolving note, effective date February 25, 2008, in the face amount of $2,700,000, with a maturity date of March 1, 2010 (the "February 25, 2008 Note"). The February 25, 2008 Note required Zayat Stables to make quarterly interest payments at Prime minus 1.00%.

19

(c)     April 1, 2008 Term Note – Zayat Stables executed and delivered to Fifth Third a term note, effective date April 1, 2008, in the original principal amount of $6,000,000, with a maturity date of March 1, 2012 (the "First April 1, 2008 Note"). The First April 1, 2008 Note required Zayat Stables to make quarterly interest payments at Prime minus 1.00%, plus annual principal payments in the amount of $2,000,000 on the first day of March each year, beginning on March 1, 2010.

(d)     April 1, 2008 Term Note – Zayat Stables executed and delivered to Fifth Third a term note, effective date April 1, 2008, in the original principal amount of $10,000,000, with a maturity date of December 20, 2011 (the "Second April 1, 2008 Note"). The Second April 1, 2008 Note required Zayat Stables to make quarterly interest payments at Prime minus 1.00%, plus a principal payment in the amount of $1,500,000 on December 20, 2009, and a principal payment in the amount of $2,000,000 on December 20, 2010.

(e)     April 1, 2008 Term Note – Zayat Stables executed and delivered to Fifth Third a term note, effective date April 1, 2008, in the original principal amount of $3,945,970, with a maturity date of December 15, 2011 (the "Third April 1, 2008 Note"). The Third April 1, 2008 Note required Zayat Stables to make quarterly interest payments at Prime minus 1.00%, plus a principal payment in the amount of $1,000,000 on December 20, 2009, and a principal payment in the amount of $1,500,000 on March 1, 2010.

(f)     September 23, 2008 Term Note – Zayat Stables executed and delivered to Fifth Third a term note, effective date September 23, 2008, in the original principal amount of $3,000,000, and with a maturity date of March 1, 2009 (the "September 23, 2008 Note"). The September 23, 2008 Note required Zayat Stables to make quarterly interest payments at Prime.

(g)     January 14, 2009 Draw Note – Zayat Stables executed and delivered to Fifth Third a draw note, effective date January 14, 2009, in the maximum principal amount of $3,000,000, and with a maturity date of January 1, 2010 (the "January 14, 2009 Note"). The January 14, 2009 Note required Zayat Stables to make quarterly interest payments at the Libor Rate plus 2.75%.[7]

---

[7] Pursuant to the Fifth Third Claim Litigation (defined below), the Debtor does not acknowledge the indebtedness to Fifth Third and has sought entry of a judgment directing Fifth Third to prove the validity, extent and priority of Fifth Third's security interest in and lien on the Debtor's assets.  In addition, nothing herein shall constitute a finding that Fifth Third has a valid security interest in and lien on the Debtor's assets.

20

The Prepetition Credit Facility is governed by that certain credit and security agreement dated as of August 1, 2007, as amended on January 14, 2009 (collectively, the "Prepetition Security Agreement"), and made as collateral security for: (a) the Notes; and (b) all other obligations, which include all loans, advances, indebtedness and each and every other obligation or liability of the Debtor and Pioneer of the Nile, Ltd.[8] owed to Fifth Third (as further defined in the Prepetition Security Agreement).

In accordance with the Prepetition Security Agreement, the Prepetition Credit Facility is secured by:

(a)    all thoroughbred bloodstock and/or stallion shares and/or fractional interest(s) therein, their offspring and young, both born and unborn, and/or fractional interest(s) therein, stallion seasons and shares, and any other interest(s) in any of the above owned by the Debtor and/or Pioneer, however classified, whether now owned or after-acquired, including all substitutions thereof (the "Equine Collateral");

(b)    all policies of insurance maintained on the Equine Collateral and all rights to proceeds thereof and refunds thereunder, whether now owned or after-acquired;

(c)    all accounts, deposit accounts, accounts receivable, notes receivable, chattel paper, general intangibles and rights to payment arising out of or in any way relating to the sale, transfer, or other conveyance of all or any interest in any of the Equine Collateral, whether now owned or after-acquired;

(d)    all racing income, breeder's awards income from sales of stallion seasons and shares and any other income derived from or in any way related to the Equine Collateral, whether now owned or after-acquired;

(e)    all certificates of title, certificates of registration and other evidences of ownership, relating to, or in any way connected with, the Equine Collateral, including without limitation, all Jockey Club Certificates of Registration and

---

[8] Pioneer of the Nile, Ltd. ("Pioneer") is an entity which is wholly owned by Ahmed Zayat.  Pioneer is a co-guarantor (see below) of the Prepetition Credit Facility.

all stallion share certificates and stallion syndication agreements, whether now owned or after-acquired;

(f)     the savings account, having the account number 7380700760, held by the Debtor with Fifth Third (the "Fifth Third Savings Account") (the Equine Collateral and the Fifth Third Savings Account is hereinafter referred to as the "Collateral"); and

(g)     all proceeds and products of the Equine Collateral and the Fifth Third Savings Account (the "Proceeds," and together with the Equine Collateral and the Fifth Third Savings Account, hereinafter referred to as the "Collateral").

In addition, on or about January 14, 2009, Pioneer and Ahmed Zayat each executed a guaranty (the "Zayat Guaranty" and the "Pioneer Guaranty"), whereby both parties agreed to guarantee the payment of all monies due, or which may thereafter become due, to Fifth Third under the Prepetition Credit Facility.  Both of the Zayat Guaranty and Pioneer Guaranty have a liability limit of $38,700,000.00.[9]

As of the Commencement Date, Fifth Third asserts that it was owed approximately $34,456,405.00 in outstanding obligations under the Prepetition Credit Facility.

## 2.  Keeneland Association, Inc.

The Debtor is also indebted to Keeneland Association, Inc. ("Keeneland"), a combination thoroughbred race horse and bloodstock sales company (the "Keeneland Loan").  The Keeneland Loan was in the aggregate amount of $3,135,500.00 and relates to the Debtor's purchase of twenty-four (24) horses (the "Keeneland Horses") in September 2009.

The Keeneland Loan is memorialized by that certain note (the "Keeneland Note") and security agreement (the "Keeneland Security Agreement"), each dated as of October 12, 2009.  In accordance with the Keeneland Security Agreement, the Keeneland Note is secured by the

---

[9] Pioneer and Mr. Zayat disputed the validity of the guaranties in the Answer and Counterclaim filed in the District Court Action (defined below).

48051/0001-6285623v9

Keeneland Horses as well as the "proceeds" and "products" from same, as such term is defined in the Uniform Commercial Code of the State of Kentucky, and as further defined in the Keeneland Security Agreement.

As of the Commencement Date, the amount outstanding under the Keeneland Loan was $2,381,500.00.

### 3.  Service Provider Claims

As of the Commencement Date, the Debtor had other debt (the "Service Provider Claims"), which consists primarily of amounts due and owing to trainers, boarders, specialists, and veterinarians (collectively, the "Service Providers").  The Debtor estimates, as indicated in Schedule D of the Debtor's Schedules (as defined below), that there are two (2) potential holders of Service Provider Claims, one with a claim of $6,095.10 and the other with an unknown claim amount.

### 4.  Unsecured Debt and Equity Structure

Pursuant to Schedule F of the Schedules (as defined below), the Debtor listed $1,898,625.01 (including a $750,000 loan from Sherif El Zayat to the Debtor that will be assigned to Mr. Zayat under the Plan) million of general unsecured debt (the "Unsecured Debt") to approximately eighty-one (81) different creditors as of the Commencement Date.

Mr. Zayat owns 100% of the Equity Interests in the Debtor.

### C.    Events Precipitating the Chapter 11 Case

### 1.  The Downturn in the Equine Industry

Due to the deep recession, there has been an overall deterioration in the equine industry. Racetracks implemented purse cuts, reduced their stakes program and cut their racing days.  The gross purses for all races in 2009 declined almost 10% from the prior year.  A correction of pricing in the equine auction marketplace also continued.  Keeneland, the major auction house,

experienced gross sales of approximately $400 million in 2009, down over 50% in only two

years from $815 million in 2007.

As a result of the downturn, the Debtor's primary assets– thoroughbred racehorses – have

lost substantial value in the past two years.  For the year ended December 31, 2009, the Debtor

generated total revenue in excess of $21 million.

### 2.    Negotiations with Fifth Third

In late 2008 and early 2009, as a result of the ongoing credit crisis and economic

recession and a continuing correction of pricing in the equine auction marketplace, it became

apparent to the Debtor that it was necessary to restructure the existing indebtedness associated

with the Loans, which at that time totaled at least $28 million.

The Debtor and Fifth Third engaged in a series of restructuring negotiations with respect

to the Loans.  The Debtor relied upon statements, promises and agreements made by Fifth Third

to the Debtor's substantial detriment.  Without cause or justification, Fifth Third ultimately failed

and refused to implement the agreed-upon restructuring, re-amortization and extension of the

Loan portfolio, and issued a notice to the Debtor on December 14, 2009, purporting to accelerate

the entire Loan portfolio thereby positioning the Debtor for financial failure.

### 3.   The District Court Action

On December 15, 2009, Fifth Third filed a complaint (the "Fifth Third Complaint") in the

United States District Court for the District of Kentucky (the "District Court") against the

Debtor, Ahmed Zayat and Pioneer of the Nile, Ltd. (each a "District Court Defendant" and

collectively, the "District Court Defendants") to collect on the Notes, the Zayat Guaranty and the

Pioneer Guaranty, as well as to foreclose on collateral and appoint a receiver.

On January 4, 2010, Fifth Third filed an Emergency Motion for Appointment of a

Receiver and For an Order Compelling Compliance with Certain Disclosure and other

24

Obligations Related to Collateral (the "Emergency Receivership Motion," and together with the Fifth Third Complaint, the "District Court Action").

On January 22, 2010, the District Court Defendants filed an Answer and Counterclaim, as amended in the District Court Action for declaratory judgment, damages and other relief in connection with lender liability claims based on the long standing pattern of misleading, deceptive and predatory lending practices perpetrated by Fifth Third.  In addition, the District Court Defendants filed a Memorandum in Opposition to the Emergency Receivership Motion.

The District Court had scheduled an evidentiary hearing on the Emergency Receivership Motion for February 8, 2010.

### 4.  The Decision to File For Chapter 11 Relief

Facing liquidity concerns, and given the rapid pace at which Fifth Third had moved to appoint a receiver, and its apparent desire to "fire sale" the horses, Zayat Stables hired counsel and financial advisors to assist it in assessing its current circumstance and evaluating restructuring alternatives.  Zayat Stables and its advisors devoted substantial time examining the business, determining funding requirements, and exploring strategic alternatives.  After due consideration and deliberation, Zayat Stables determined that filing for Chapter 11 protection was the best and only option for it to preserve its business as a going concern and maximize value for all creditors.  Without a Chapter 11 filing, the Debtor would have been subject to insufficient working capital, recurrent liquidity crises, and having to defend against the emergency appointment of a receiver brought on by Fifth Third, seemingly intent on a liquidation of the Debtor to the detriment of all creditors.

### III.    THE CHAPTER 11 CASE

The following is a brief description of certain major events that have occurred during the Chapter 11 Case.

48051/0001-6285623v9

### A.      The Voluntary Petition

On February 3, 2010, the Debtor commenced this Chapter 11 Case by filing a voluntary

petition for relief with the Bankruptcy Court.  From and after the Commencement Date, has

continued to conduct its business and manage its property as a debtor in possession pursuant to

sections l107(a) and 1108 of the Bankruptcy Code.  The Debtor is authorized to operate in the

ordinary course of business.

An immediate effect of the filing of the bankruptcy petition was the imposition of the

automatic stay under section 362 of the Bankruptcy Code, which, among other things, enjoined

the District Court Action against the Debtor.  The stay remains in effect, unless modified or lifted

by the Bankruptcy Code, until such matters are addressed through the Plan.  In addition, pursuant

to the Cash Collateral Consent Order, the parties agreed that the District Court Action was stayed

through and including March 12, 2010.  Furthermore, the court in the District Court Action, sua

sponte, entered an order on February 5, 2010, staying (the "Stay") the District Court Action as to

all the District Court Defendants.

### B.      First Day Orders

On the Commencement Date, the Debtor sought approval from the Bankruptcy Court of

certain motions and applications (the "First Day Motions") that the Debtor filed simultaneously

with its voluntary petition.  The Debtor sought this relief to minimize disruption of the Debtor's

business operations as a result of the Chapter 11 filing, to establish procedures in the Chapter 11

Case for the Debtor's ongoing operations, administration of the Chapter 11 Case, and interim

compensation for the estate's professionals, and to facilitate the Debtor's reorganization efforts.

Hearings were held on the First Day Motions on February 5, 2010 (the "First Day

Hearing").  The Bankruptcy Court granted all the relief requested by the Debtor in the First Day

Motions at the First Day Hearing and entered the following orders:

48051/0001-6285623v9

1. **Order (A) Authorizing Debtor to Maintain Certain Active Bank Accounts and Continue Use of its Existing Business Forms, and (B) Approving Debtor's Cash Management System (the "Cash Management Order") [Docket No. 21].**

The Cash Management Order authorized the Debtor to, among other things, use its

existing cash management system, including its bank accounts, and business forms.

2. **Order (A) Granting Interim Relief, (B) Authorizing the Payment of Adequate Assurance for Postpetition Utility Services; (C) Fixing Final Hearing Date to Determine Adequate Assurance; And (D) Granting Other Related Relief (the "Utility Order") [Docket No. 22].**

The Utility Order authorized the payment of adequate assurance for post-petition utility

service and fixed a final hearing date to determine adequate assurance.

3. **Order Authorizing the Debtor to (I) Satisfy, and to the Extent Applicable, Directing the Payroll Bank to Honor, Prepetition Gross Salaries, Payroll Taxes and Related Employee Benefit Obligations to the Debtor's Employees, and (II) Honor, in its Discretion, Pre-Petition Sick, Vacation and Personal Days; and Granting Related Relief (the "Employee Order") [Docket No. 23].**

The Employee Order authorized the Debtor to pay certain employee obligations that

existed as of the Commencement Date and to continue certain employee benefits thereafter.

4. **Administrative Order Establishing Procedures for all Allowance and Payment of Interim Compensation and Reimbursement of Expenses to Professionals (the "Administrative Order") [Docket No. 24].**

The Administrative Order established a procedure for the: (i) filing of interim Fee

Applications by Professionals; (ii) filing of objections to interim Fee Applications; and (iii)

payment by the Debtor of fees and reimbursement of expenses to Professionals.

5. **Interim Order (A) Authorizing the Debtor's Interim and Final Use of Cash Collateral and Granting Adequate Protection and (B) Scheduling Final Hearing (the "Interim Cash Collateral Order") [Docket No. 25].**

The Bankruptcy Court entered the Interim Cash Collateral over an objection filed by

Fifth Third.  The Interim Cash Collateral Order authorized the Debtor's use of cash collateral up

48051/0001-6285623v9

to the aggregate amount of $1,040,892.00 through March 8, 2010 for the maintenance and

preservation of the Debtor's assets and the continued operation of the business.

### C.    Consent Order Authorizing the Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. §§ 361 and 363 and Fed. R. Bankr. P. 4001 and Granting Related Relief (the "Cash Collateral Consent Order") [Docket No. 63]

On March 8, 2010, the Court approved the Cash Collateral Consent Order, pursuant to

which the parties agreed, among other things, to the Debtor's use of cash collateral under the

terms set forth therein.

### D.    Debtor's Retention of Professionals

To assist it in carrying out its duties as debtors in possession and to otherwise represent

their interests in the Chapter 11 Case, the Debtor has employed, with authorization from the

Bankruptcy Court, the following professionals:  Cole, Schotz, Meisel, Forman & Leonard, P.A.

("Cole Schotz") as Bankruptcy Counsel and J.H. Cohn LLP ("J.H. Cohn") as Financial Advisors.

On March 1, 2010, the Court approved the retention of Cole Schotz [Docket No. 50] and

J.H. Cohn [Docket No. 51].

### E.    Appointment of the Creditors' Committee

On March 11, 2010, the Office of the United States Trustee appointed the Creditors'

Committee as the representative of the Debtor's General Unsecured Creditors in the Chapter 11

Case.  The members of the Creditors' Committee are (a) Joseph Dowd, D.V.M., Equine Medical

& Surgical Group, (b) J. Reiley McDonald, Eaton Sales, LLC and (c) Peter J. Belanto, Mike

Mitchell Racing Stable.  On March 24, 2010, the Creditors' Committee filed an application to

retain Porzio, Bromberg & Newman, P.C. ("Porzio") as their bankruptcy counsel.  On April 5,

2010, the Court approved the retention of Porzio [Docket No. 78].

### F.    DIP Loan

On March 23, 2010, the Bankruptcy Court entered an order approving debtor-in-

possession financing in the amount of $2,450,000.00 (the "DIP Loan") [Docket No. 71].  The

28

DIP Loan was provided by Sherif El Zayat (the "DIP Lender") pursuant to an unsecured promissory note (the "DIP Note"). The DIP Lender's claims under the DIP Note will be afforded administrative expense status pursuant to sections 364(b), 503(b)(1) and 507(a)(2) of the Bankruptcy Code. The Debtor is authorized to use the proceeds of the DIP Loan in accordance with the budget approved by the Bankruptcy Court.

### G.   Claims Process and Bar Dates

In a Chapter 11 case, pre-petition claims against a debtor are generally established either as a result of being listed in the debtor's schedules of liabilities as not being contingent, unliquidated, or disputed or through assertion by the creditor in a timely filed proof of claim. Claims asserted by creditors are then either allowed or disallowed. If allowed, a claim will be recognized and treated pursuant to a plan. If disallowed, the creditor will have no right to obtain any recovery on or to otherwise enforce its claim against the debtor.

### 1.   Filing of Schedules and Statements

On February 17, 2010, the Debtor filed with the Bankruptcy Court its Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket No. 42] (collectively, the "Schedules"). The Schedules set forth, among other things, the pre-petition claims against the Debtor based on the Debtor's books and records.

### 2.   Bar Dates for Filing Proofs of Claim

The Bankruptcy Court established June 1, 2010 (the "Bar Date") as the deadline for filing proofs of claim with the Clerk of the Bankruptcy Court for any pre-petition claims against the Debtor and August 2, 2010 for such claims of governmental entities. The Bankruptcy Court is maintaining a register of the filed proofs of claims. Pursuant to the Plan, the Debtor will seek to establish a deadline for the filing of Administrative Expense Claims that is thirty (30) days after the Effective Date or the first Business Day following such day.

48051/0001-6285623v9

### 3.   Filed Claims and the Claims Objection Process

The Debtor continues to engage in the process of reviewing the filed proofs of claim and reserves its rights to file objections to claims that are lacking in legal or factual merit.

### H.   Other Significant Events

On March 2, 2010, Fifth Third filed a motion (the "Lift Stay Motion") in the District Court to lift the Stay as to the non-debtor District Court Defendants, namely Mr. Zayat and Pioneer.  In addition, despite the Stay being in place, Fifth Third filed motions to dismiss the counterclaim and for partial summary judgment.  Subsequently, the parties agreed by way of stipulation and consent order that Mr. Zayat and Pioneer were only required to file an opposition to the Lift Stay Motion.  On April 5, 2010, Mr. Zayat and Pioneer filed their opposition to the Lift Stay Motion.  In the event the District Court lifts the Stay, Mr. Zayat and Pioneer have 21 days from the entry of that order to respond to the motions to dismiss the counterclaim and for partial summary judgment.  As of the date of this Disclosure Statement, the District Court has not yet decided the Lift Stay Motion.

On April 5, 2010, the Debtor initiated an adversary proceeding (Adv. Pro. No. 10-1478) in the Chapter 11 Case by filing a complaint (the "Complaint")[10] against Fifth Third in connection with the multi-million dollar lender liability claims arising out of the long-standing pattern of misleading, deceptive and predatory lending practices perpetrated by Fifth Third in connection with the Prepetition Credit Facility (the "Fifth Third Claim Litigation").  The Complaint asserts eight separate counts against Fifth Third for (i) breach of contract, (ii) promissory estoppel, (iii) equitable estoppel, (iv) declaratory relief, (v) intentional misrepresentation, (vi) breach of the implied covenant of good faith and fair dealing, (vii)

---

[10] Holders of Claims and Equity Interests can request a copy of the Complaint by contacting Debtor's counsel at (201) 489-3000.

48051/0001-6285623v9

determination of the extent, validity and priority of Fifth Third's security interests in and lien on

the Debtor's assets and (viii) equitable subordination.  On May 10, 2010, Fifth Third filed an

answer to the Complaint.  Thereafter, on May 13, 2010, Fifth Third filed a motion for entry of an

order withdrawing the reference of the Fifth Third Claim Litigation to the Bankruptcy Court (the

"Motion to Withdraw the Reference").  The United States District Court for the District of New

Jersey has scheduled a hearing date of June 21, 2010 to consider the Motion to Withdraw the

Reference.  The Debtor intends to object to the Motion to Withdraw the Reference.

## IV.    <u>SUMMARY OF THE PLAN OF REORGANIZATION</u>

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND

IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF

CLAIMS AND EQUITY INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS

ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS

DISCLOSURE STATEMENT, TO THE EXHIBITS ATTACHED THERETO, AND THE

PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE

SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS

REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE

STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF

ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO

THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS

FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL

CONTROL THE TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN,

THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE

BINDING UPON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE

DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST.  IN THE
EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE
PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR
SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

A.      **Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.
Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors
and shareholders.  Upon the filing of a petition for relief under Chapter 11, section 362 of the
Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against
the debtor and its property, including all attempts to collect claims or enforce liens that arose
prior to the commencement of the Chapter 11 cases.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the
legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides
that the debtor may continue to operate its business and remain in possession of its property as a
"debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11
case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a
debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan
binding upon the debtor, any issuer of securities under the plan, any person acquiring property
under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such
creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or
retains any property under the plan.  Subject to certain limited exceptions, and other than as
provided in the plan itself or the confirmation order, the confirmation order discharges the debtor
from any debt that arose prior to the date of confirmation of the plan.

32

### B.   Classification and Treatment of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Plan to place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.

The Debtor believes that the Plan has classified all Claims and Equity Interests (other than Administrative Expense Claims, Professional Compensation and Reimbursement Claims, Priority Tax Claims and the DIP Loan Claim which, pursuant to section 1123(a)(1) of the Bankruptcy Code, do not need to be classified) in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Equity Interest may challenge the Debtor's classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

33

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtor's assets.

### 1.    Treatment of Unclassified Claims

Certain types of Claims are not placed into voting classes; instead they are unclassified. Such Claims are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided under the Bankruptcy Code.  As such, the Debtor has not placed such Claims in a Class.  The treatment of these Claims is provided below:

### a.    Administrative Expense Claims

(i)    Subject to the allowance procedures and the deadlines provided herein, and except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a different treatment, except as provided herein, Allowed Administrative Expense Claims will be paid in Cash in full by the Reorganized Debtor on the Effective Date or as soon thereafter as is practicable, but not later than the later of: (i) twenty (20) days after the Effective Date; or (ii) thirty (30) days from the date of entry of a Final Order determining and Allowing such Claim as an Administrative Expense Claim.

(ii)    Allowed Administrative Expense Claims representing Postpetition Administrative Trade Claims will be paid in full and/or performed by the Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements or Bankruptcy Court Orders governing instruments evidencing or other documents relating to, such transactions.

(iii)    Allowed Administrative Expense Claims representing pre-petition liabilities to those employees (other than insiders as defined in section 101(31) of the Bankruptcy Code) that are or were employed by the Debtor as of the Commencement Date including Claims for wages, salaries and commissions and for accrued but unused vacation, sick or personal days may be provided with priority over all other Allowed Administrative Expense Claims

pursuant to section 507(a)(4) of the Bankruptcy Code, but the Debtor believes all such Claims either (a) have been satisfied during the Bankruptcy Case based on the Bankruptcy Court's entry of an Order on February 4, 2010: (i) authorizing the Debtor to (A) satisfy, and, to the extent applicable, directing the payroll bank to honor, pre-petition gross salaries, payroll taxes and related employee benefit obligations to the Debtor's employees, and (B) honor, in its discretion, pre-petition sick, vacation and personal days; and (ii) granting related relief or (b) will be satisfied in the ordinary course of business after the Effective Date.

(iv)    Notwithstanding anything herein to the contrary, all fees due and payable to the Clerk's Office pursuant to section 1930 of Title 28 of the United States Code, including, without limitation, any United States Trustee quarterly fees incurred pursuant to section 1930(a)(6) of title 28 of the United States Code will be paid on the Effective Date.

### b.    Professional Compensation and Reimbursement Claims

Any Person seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code: (i) must file respective final Fee Applications for services rendered and reimbursement of expenses incurred through the Confirmation Date no later than sixty (60) days after the Confirmation Date or such other date as may be fixed by the Bankruptcy Court and, (ii) if granted such an award by the Bankruptcy Court, will be paid by the Reorganized Debtor in full in such amounts as are Allowed by the Bankruptcy Court (a) seven (7) days after such Professional Compensation and Reimbursement Claim becomes an Allowed Professional Compensation and Reimbursement Claim, or as soon thereafter as is practicable, or (b) upon such other terms as may be mutually agreed upon between such Holder of an Allowed Professional Compensation and Reimbursement Claim and the Reorganized Debtor, on and after the Effective Date.  Failure to file a final Fee Application timely will result in the Professional Compensation and Reimbursement Claim being forever barred and discharged. Objections to such applications must be filed and served on the Reorganized Debtor, its

35

counsel, counsel to the Creditors' Committee and the requesting Professional or other entity on

or before the date that is thirty (30) days (or such longer period as may be allowed by order of

the Bankruptcy Court) after the date on which the applicable application was served.

Notwithstanding anything herein to the contrary, and except as otherwise

provided by prior Order of the Bankruptcy Court:  (i) payment of a Professional Compensation

and Reimbursement Claim that is an Allowed Claim as of the Confirmation Date will be made

on the Effective Date; and (ii) payment of a Professional Compensation and Reimbursement

Claim that becomes an Allowed Claim following the Effective Date will be made on or before

the date that is the earlier of (a) the date such Professional Compensation and Reimbursement

Claim is required to be paid in accordance with any applicable administrative order governing

the payment of fees and expenses of Professionals or (b) seven (7) days after an Order deeming

such Professional Compensation and Reimbursement Claim an Allowed Claim is entered by the

Bankruptcy Court.

      **c.**      **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim will receive in full satisfaction of

such Allowed Priority Tax Claim (i) payment in Cash equal to the unpaid portion of such

Allowed Priority Tax Claim on the Effective Date, (ii) over a period through the fifth anniversary

of the Commencement Date, deferred cash payments in an aggregate amount equal to such

Allowed Priority Tax Claim, plus interest on such aggregate amount over such period or (iii)

such other treatment as to which the Debtor or the Reorganized Debtor, as the case may be, and

such Holder will have agreed upon in writing; provided, however, that any Claim or demand for

payment of a penalty (other than a penalty of the type specified in section 507(a)(8)(G) of the

Bankruptcy Code) will be disallowed pursuant to this Plan and the Holder of an Allowed Priority

Tax Claim will not assess or attempt to collect such penalty from the Debtor, its Estate or the

Reorganized Debtor.

36

### d.    DIP Loan Claim

The Allowed DIP Loan Claim will be satisfied in full by the assignment by the DIP Lender to Zayat of the DIP Loan and the forgiveness by Zayat of the obligation of the Debtor to repay the DIP Loan in partial consideration for the Reinstatement of the Equity Interests.  The DIP Loan will be fully drawn to the extent any balance remains as of the Effective Date.  On the Effective Date, the DIP Loan will be cancelled and treated as a capital contribution by Zayat to the Reorganized Debtor.  The consideration, if any, for the assignment of the DIP Loan by the DIP Lender to Zayat shall not be paid by estate funds.

### 2.    Treatment of Classified Claims and Equity Interests

Except for the DIP Loan Claim, Administrative Expense Claims, Professional Compensation and Reimbursement Claims and Priority Tax Claims discussed above, all Claims against, and Equity Interests in, the Debtor and with respect to all property of the Debtor and its Estate, are defined and hereinafter designated in respective Classes.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Class or Classes.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released or otherwise satisfied or waived before the Effective Date.  Notwithstanding anything to the contrary contained in the Plan, no distribution will be made on account of any Claim that is not an Allowed Claim.

The Plan is intended to deal with all Claims against and Equity Interests in the Debtor, of whatever character, whether known or unknown, whether or not with recourse, whether or not contingent or unliquidated, and whether or not previously Allowed by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code.  However, only Holders of Allowed Claims and

48051/0001-6285623v9

Allowed Equity Interests will receive any distribution under the Plan.  For purposes of

determining Pro Rata distributions under the Plan and in accordance with the Plan, Disputed

Claims will be included in the Class in which such Claims would be included if Allowed, until

such Claims are finally disallowed:

| Class | Status |
|---|---|
| Class 1 – Other Priority Claims | Unimpaired |
| Class 2 – Fifth Third Claim | Impaired |
| Class 3 – Keeneland Claim | Impaired |
| Class 4 – Service Provider Claims | Impaired |
| Class 5 – Other Secured Claims | Unimpaired |
| Class 6 – General Unsecured Claims | Impaired |
| Class 7 – Equity Interests in Zayat Stables | Unimpaired |

  **a.**  **Class 1 – Other Priority Claims**

    (i)  <u>Impairment and Voting</u>.  Class 1 Other Priority Claims are

Unimpaired under the Plan.  Therefore, Holders of Class 1 Other Priority Claims are not entitled

to vote to accept or reject the Plan and are conclusively deemed to have accepted the Plan

pursuant to section 1126(f) of the Bankruptcy Code.

    (ii)  <u>Treatment</u>.  On or as soon as reasonably practicable after the later

of (a) the Effective Date or (b) the Distribution Date immediately following the date on which an

Other Priority Claim becomes an Allowed Priority Claim, the Holder of an Allowed Other

Priority Claim will receive (i) Cash equal to the amount of such Allowed Other Priority Claim,

without interest or (ii) such other treatment as to which the Debtor or the Reorganized Debtor, as

the case may be, and such Holder will have agreed upon in writing.

  **b.**  **Class 2 – Fifth Third Claim**

    (i)  <u>Impairment and Voting</u>.  Class 2 is Impaired under the  Plan.

Therefore, the Holder of the Class 2 Fifth Third Claim is entitled to vote to accept or reject the

Plan.

38

(ii)    <u>Treatment</u>.  The Class 2 Fifth Third Claim will be repaid, restructured and re-amortized in accordance with the Fifth Third Amended Loan Documents in substantially the form attached hereto as Exhibit A.  The Holder of the Fifth Third Claim will, in full, final, and complete satisfaction of such Allowed Fifth Third Claim, be paid in Cash one hundred (100%) percent of its Allowed Fifth Third Claim in installments in accordance with the Fifth Third Payment Schedule on the later of (i) the applicable Fifth Third Payment Dates and (ii) the date on which the Fifth Third Claim becomes an Allowed Claim; <u>provided</u>, <u>however</u>, that the Reorganized Debtor is entitled to make Cash payments to Fifth Third on account of the Allowed Fifth Third Claim at any time without penalty.  All Installment Payments of Cash to Fifth Third will be held in the Interest Bearing Escrow Account pending the conclusion of the Fifth Third Claim Litigation.

The Fifth Third Interest Payment Schedule is as follows:

(a)    <u>First Interest Payment Date</u>:  By the Effective Date or as soon as practicable, the Reorganized Debtor will pay accrued interest at the existing contract rate (prime minus 1%).

(b)    <u>Monthly Interest Payment Dates</u>:  After the Effective Date, the Reorganized Debtor will pay monthly interest in arrears each month at a rate per annum equal to LIBOR plus 300 basis points.

The Fifth Third Principal Payment Schedule is as follows:

(c)    <u>First Principal Payment Date</u>:  On or before December 31, 2010, the Reorganized Debtor will reduce the principal of the Fifth Third Consolidated Loan by $5.0 million; <u>provided</u>, <u>however</u>, the Debtor has already paid Fifth Third approximately $607,500 in accordance with the Cash Collateral Order, which payment will be credited towards

39

and reduce the principal payments required under this subsection (iii) by the Reorganized Debtor

to Fifth Third by December 31, 2010.

(d)    Second Principal Payment Date:  On or before December

31, 2011, the Reorganized Debtor will reduce the principal of the Fifth Third Consolidated Loan

by an amount equal to 40% of the proceeds from all sales of any Debtor owned horses or

portions thereof during calendar year 2011, which Zayat Stables projects is approximately $6.3

million; provided, however, that Zayat Stables will guaranty a minimum principal payment of

$3.0 million.

(e)    Third Principal Payment Date:  On or before December 31,

2012, the Reorganized Debtor will reduce the principal of the Fifth Third Consolidated Loan by

an amount equal to 40% of the proceeds from all sales of any Debtor owned horses or portions

thereof during calendar year 2012, which Zayat Stables projects is approximately $4.2 million;

provided, however, that Zayat Stables will guaranty a minimum principal payment of $3.0

million.

(f)    Fourth Principal Payment Date:  On or before December

31, 2013, the Reorganized Debtor will reduce the principal of the Fifth Third Consolidated Loan

by an amount equal to 40% of the proceeds from all sales of any Debtor owned horses or

portions thereof during calendar year 2013, which Zayat Stables projects is approximately $4.6

million; provided, however, that Zayat Stables will guaranty a minimum principal payment of

$3.0 million.

(g)    Fifth Principal Payment Date:  On or before December 31,

2014 (the "Extended Maturity Date"), the Reorganized Debtor will make a balloon payment of

the unamortized balance of the Fifth Third Consolidated Loan, which is projected at $14.4

million.

40

All liens, rights, priorities, security interests and other encumbrances and rights granted to Fifth Third against the Fifth Third Collateral will remain in full force and effect despite the confirmation of the Plan and entry of the Confirmation Order; provided, however, that the Fifth Third Claim Litigation may impact the liens, rights, priorities, security interests and other encumbrances and rights granted to Fifth Third against the Fifth Third Collateral.

      c.    **Class 3 – Keeneland Claim**

      (i)    <u>Impairment and Voting</u>.  Class 3 is Impaired under the Plan. Therefore, the Holder of the Class 3 Keeneland Claim is entitled to vote to accept or reject the Plan.

      (ii)    <u>Treatment</u>.  The Holder of the Class 3 Keeneland Claim will, in full, final, and complete satisfaction of such Class 3 Keeneland Claim, be paid in Cash one hundred (100%) percent of its Allowed Keeneland Claim in installments consisting of interest and principal in accordance with the Keeneland Payment Schedule.

The Keeneland Interest Payment Schedule is as follows:

      (a)    <u>First Interest Payment Date</u>:  On the Effective Date or as soon as practicable, the Reorganized Debtor will pay accrued interest at the existing contract rate.

      (b)    <u>Monthly Interest Payment Dates</u>:  After the Effective Date, the Reorganized Debtor will pay monthly interest in arrears at a rate per annum equal to 5.5%.

The Keeneland Principal Payment Schedule is as follows:

      (c)    <u>Principal Payment Dates</u>:  The Reorganized Debtor will make principal payments in six (6) equal semi-annual installments of approximately $397,000 beginning on or before December 31, 2010.

48051/0001-6285623v9

All liens, rights, priorities, security interests and other encumbrances and rights granted to Keeneland against the Keeneland Horses will remain in full force and effect despite the confirmation of the Plan and entry of the Confirmation Order.

### d.    Class 4 – Service Provider Claims

(i)    <u>Impairment and Voting</u>.  Class 4 is Impaired by this Plan. Therefore, the Holders of the Class 4 Service Provider Claims are entitled to vote to accept or reject the Plan.

(ii)    <u>Treatment</u>.  Each Holder of an Allowed Class 4 Service Provider Claim will, in full, final, and complete satisfaction of its Class 4 Service Provider Claim, be paid Cash equal to one hundred (100%) percent of its Allowed Service Provider Claim on or before December 31, 2010.

### e.    Class 5 – Other Secured Claims

(i)    <u>Impairment and Voting</u>.  Class 5 is Unimpaired by the Plan. Therefore, the Holders of the Class 5 Other Secured Claims are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

(ii)    <u>Treatment</u>.  Each Holder of an Allowed Other Secured Claim will have its Claim Reinstated on the Effective Date unless the Debtor or the Reorganized Debtor, as the case may be, and the Holder of an Allowed Other Secured Claim will have agreed to other treatment in writing.  Prepetition Liens with respect to such Allowed Other Secured Claims will survive the Effective Date and will continue in accordance with contractual or statutory terms until such Allowed Other Secured Claim has been paid in full.

### f.    Class 6 – General Unsecured Claims

(i)    <u>Impairment and Voting</u>.  Class 6 is Impaired under the  Plan. Therefore, the Holders of Class 6 General Unsecured Claims are entitled to vote to accept or reject the Plan.

48051/0001-6285623v9

(ii)      Treatment.  Each Holder of an Allowed Class 6 General Unsecured Claim will, in full, final, and complete satisfaction of its Class 6 General Unsecured Claim, be paid Cash equal to one hundred (100%) percent of its Allowed General Unsecured Claim, without interest, in eight (8) equal quarterly payments beginning on or before December 31, 2010 and ending on September 30, 2012.

g.      **Class 7 – Equity Interests in Zayat Stables**

(i)      Impairment and Voting.  Class 7 is Unimpaired under the  Plan. Therefore, the Holder of the Class 7 Equity Interests is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

(ii)      Treatment.  In exchange for forgiving any and all Claims the Holder of the Class 7 Equity Interests has or may have against the Debtor and its Estate, including (i) any General Unsecured Claim held by the Holder of the Class 7 Equity Interests as assignee of the Sherif Claim and (ii) any Administrative Expense Claim held by the Holder of the Class 7 Equity Interests as assignee of the DIP Loan, on the Effective Date, the Holder of the Class 7 Equity Interests will have such Equity Interests Reinstated in full.  The consideration, if any, for the assignment of the Sherif Claim and the DIP Loan Claim by Sherif Zayat to Ahmed Zayat shall not be paid by estate funds.

C.      **Means for Implementation and Execution of Plan.**

In addition to the provisions set forth elsewhere in the Plan, the following will constitute the means for implementation of the Plan:

1.      **Continued Corporate Existence**.  After the Effective Date, the Reorganized Debtor will continue to exist in accordance with the applicable law in Delaware and pursuant to its organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended, restated or replaced under this Plan.

43

2.    **Members and Officers**.  On or after the Effective Date, the current

members and officers of Zayat Stables will serve as officers and members of the Reorganized

Debtor.

3.    **Amended Loan Documents with Fifth Third.**  On the Effective Date,

the Reorganized Debtor and Fifth Third will enter into the Amended Loan Documents, in

substantially the form annexed as Exhibit A to the Plan, under which the Reorganized Debtor

will restructure, modify and amend the Fifth Third Loan Documents in order to extend the

maturity date of the Fifth Third Loans, re-amortize the repayment of the Allowed Fifth Third

Claim, and reaffirm the liens of Fifth Third against the Fifth Third Collateral, subject to the

outcome of the Fifth Third Claim Litigation.  In addition, the Amended Loan Documents will

provide that the Zayat Guaranty and the Pioneer Guaranty are reaffirmed.

4.    **Effectiveness of Securities, Instruments and Agreements.**  On the

Effective Date, all documents set forth in the Plan, the Plan Supplement, and all other

agreements entered into or documents issued pursuant to the Plan including, without limitation,

any agreement entered into or instrument issued in connection with any of the foregoing will

become effective and binding in accordance with their respective terms and conditions upon the

parties thereto and will be deemed to become effective simultaneously.

5.    **Corporate Action, Effectuating Documents, Further Transactions.**  On

the Effective Date, all matters and actions provided for under the Plan that would otherwise

require approval of the member or managers of the Debtor or the Reorganized Debtor or their

successors-in-interest under the Plan including, without limitation, the issuance of all Plan

Documents, will be deemed to have been authorized and effective in all respects as provided

herein and will be taken without any requirement for further action by the member and managers

of the Debtor and the Reorganized Debtor.  The Debtor is authorized to execute, deliver, file or

44

record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

6. **Approval of Agreements.**  The solicitation of votes on the Plan also will be deemed as a solicitation for the approval of the Plan Supplement, the Plan Documents and all transactions contemplated by the Plan.  Entry of the Confirmation Order will constitute approval of the Plan, the Plan Supplement, the Plan Documents and all transactions contemplated thereby.

7. **Operation of the Debtor-in-Possession Between the Confirmation Date and the Effective Date.**  The Debtor will continue to operate as Debtor-in-Possession, subject to the supervision of the Bankruptcy Court, pursuant to the Bankruptcy Code, during the period from the Confirmation Date through and until the Effective Date, and any obligation incurred by the Debtor during that period will constitute an Administrative Expense Claim.

8. **Vesting of Property of the Estate.**  On or after the Effective Date, all property of the Estate, all Causes of Action, including the Fifth Third Claim Litigation, and any property acquired by the Debtor under or in connection with the Plan, will vest in the Reorganized Debtor on the Effective Date free and clear of all Liens, Claims, Interests, charges and other encumbrances, except as provided in this Plan or the Confirmation Order. Additionally, all employees and employee health and benefit plans, except and to the extent that such plans have been previously rejected or modified by an order of the Bankruptcy Court on or before the Confirmation Date, will be transferred to the Reorganized Debtor on the Effective Date or as soon as practicable thereafter.  All employee policies in effect for the Debtor as of the Confirmation Date will be in effect for the Reorganized Debtor as of the Effective Date, but may be amended thereafter at the Reorganized Debtor's sole discretion.

48051/0001-6285623v9

From and after the Effective Date, the Reorganized Debtor may operate its business, and may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code and Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article VIII of the Plan.

9.      **Preservation of Causes of Action.**  Except as otherwise provided in the Plan, the Confirmation Order or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor will retain all of the Causes of Action; provided, however, that the Reorganized Debtor shall assign all Avoidance Actions against any holder of a General Unsecured Claim to the Creditors' Committee on the Effective Date.  The Creditors' Committee shall not pursue any Avoidance Actions against any holder of a General Unsecured Claim unless there is a default under the Plan.  The Reorganized Debtor may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any and all of such Causes of Action.  The failure of the Debtor to specifically list any claim, right of action, suit, proceeding or other Cause of Action in the Plan does not, and will not be deemed to, constitute a waiver or release by the Debtor or the Reorganized Debtor of such claim, right of action, suit, proceeding or other Cause of Action and the Reorganized Debtor will retain the right to pursue such claims, rights of actions, suits, proceedings or other Causes of Action in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Cause of Action upon or after the Confirmation or consummation of the Plan.

10.      **Exemption from Certain Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the

Plan, the creation of any mortgage, deed of trust or other security interest, the making or

assignment of any lease or sublease, or the making or delivery of any deed or other instrument of

transfer under, in furtherance of, or in connection with the Plan, including, without limitation,

any merger agreements or agreements of consolidation, deeds, bills of sale or assignments

executed in connection with any of the transactions contemplated under the Plan will not be

subject to any stamp, real estate transfer, mortgage recording or other similar tax.

       **D.**     **Provisions Governing Distributions**

          **1.**     **Sources of Cash for Plan Distributions.**  All Cash distributions will be

made from available Cash of the Debtor or Reorganized Debtor, as the case may be.  Any

distribution under the Plan of property other than Cash will be made by the Debtor and/or the

Reorganized Debtor in accordance with the terms of the Plan.

          **2.**     **Disbursing Agent.**  The Disbursing Agent will make all distributions

required under the Plan (subject to the provision of Articles II, III and IV of the Plan).

          **3.**     **Application of Distribution Record Date.**  As of the close of business on

the Distribution Record Date, the claim registers for all Claims will be deemed closed, and there

will be no further changes in the record holders of such Claims.  Neither the Debtor, the

Reorganized Debtor or the Disbursing Agent will have any obligation to recognize any transfer

of Claims occurring on or after the Distribution Record Date.  The Debtor, the Reorganized

Debtor and the Disbursing Agent will be entitled to recognize and deal for all purposes under the

Plan only with those record holders stated on the claims registers as of the close of business on

the Distribution Record Date, to the extent applicable.

          **4.**     **Compliance with Tax Requirements.**  In connection with the Plan and

all Distributions thereunder, the Reorganized Debtor and the Disbursing Agent will comply with

all tax withholding and reporting requirements imposed on it by any governmental unit, and all

distributions pursuant to the Plan will be subject to such withholding and reporting requirements.

47

For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of Allowed Claims with any excess allocated, if applicable, to unpaid interest that accrued, on such Claims.

        5.      **Means of Cash Payment.**  Cash payments under the Plan will be in U.S. funds by checks drawn on a domestic bank selected by the Reorganized Debtor, or by wire transfer from a domestic bank, at the option of the Reorganized Debtor.

        6.      **Delivery And Distributions And Undeliverable Or Unclaimed Distributions.**

        (i)      Delivery of Distributions in General.  Distributions to Holders of Allowed Claims will be made at the address of the Holder of such Claim as indicated on the records of the Debtor, or a filed proof of Claim, as applicable.

        (ii)      Undeliverable Distributions.

        (a)      Holding of Undeliverable Distributions.  If any Allowed Claim Holder's distribution is returned as undeliverable, no further distributions will be made to such Holder unless and until the Debtor or Reorganized Debtor is notified in writing of such Holder's then-current address.  Undeliverable distributions will remain in the possession of the Reorganized Debtor until such time as a distribution becomes deliverable.  Undeliverable Cash will not be entitled to any interest, dividends or other accruals of any kind.

        (b)      After Distributions Become Deliverable.  Within 20 days after the end of each Quarter following the Distribution Date, the Disbursing Agent will make all distributions that become deliverable during the preceding Quarter, except as otherwise provided herein.

        (c)      Failure to Claim Undeliverable Distributions.  In an effort to ensure that all Holders of valid Claims receive their allocated distributions, the Disbursing

48

Agent will file with the Bankruptcy Court a listing of unclaimed distribution Holders.  Any

Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an

undeliverable distribution within three months after the first attempted delivery will have its

Claim for such undeliverable distribution discharged and will be forever barred from asserting

any such Claim against the Debtor, the Reorganized Debtor, or their respective property.  In such

cases, any Cash held for distribution on account of such Claims will be property of the

Reorganized Debtor, free of any restrictions thereon, and will revert to the account from which

such payment was originally issued to be distributed pursuant to this Plan.  Nothing contained in

the Plan will require the Reorganized Debtor or the Disbursing Agent to attempt to locate any

Holder of an Allowed Claim.

       7.       **De Minimus Distributions.**  Any Holder of an Allowed Claim whose

aggregate distribution under this Plan is less than twenty-five dollars ($25) will forfeit, at the

option of the Disbursing Agent, such amount to, and such amount will vest in, the Reorganized

Debtor for distribution in accordance with the terms of the Plan.

       8.       **Fractional Dollars.**  Any other provision of the Plan notwithstanding,

payments of fractions of dollars will not be made.  Whenever any payment of a fraction of a

dollar under this Plan would otherwise be called for, the actual payment made will reflect a

rounding of such fraction to the nearest whole dollar (up or down), with half dollars being

rounded up.

       9.       **Allocation Of Plan Distributions Between Principal and Interest.**  To

the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of

indebtedness and accrued but unpaid interest thereon, such Distribution will be allocated to the

principal amount of the Claim first and then, to the extent the consideration exceeds the principal

amount of the Claim, to accrued but unpaid interest.

48051/0001-6285623v9

10.     **Setoffs and Recoupments.**  The Debtor and the Reorganized Debtor, as

applicable, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy

law, exercise its right of setoff or recoupment against any Allowed Claim and the distributions to

be made pursuant to this Plan on account of such Claim (before distribution is made or account

of such Claim), the claims, rights and causes of action of any nature that the Debtor may hold

against the Holder of such Allowed Claim; provided, however, that neither the failure to effect

such a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or

release by the Debtor or Reorganized Debtor of any such claims, rights and causes of action that

the Debtor or Reorganized Debtor may possess against such Holder.

11.     **Prepayments.**  Except as otherwise provided in the Plan or the

Confirmation Order, the Debtor will have the right to prepay, without penalty, all or any portion

of an Allowed Claim upon authorization of the Bankruptcy Court; provided, however,  that any

such prepayment will not be violative or, otherwise prejudice, the relative priorities and parities

among Classes of Claims.

E.     **Procedures for Resolving Disputed, Contingent and Unliquidated Claims.**

1.     **Prosecution of Objections to Claims.**  Except as set forth in the Plan or

any applicable Order of the Bankruptcy Court with respect to Administrative Expense Claims

and Professional Compensation and Reimbursement Claims, all objections to Claims must be

filed and served on the Holders of such Claims by the Claims Objection Deadline, as the same

may be extended by the Bankruptcy Court.  After the Effective Date, only the Reorganized

Debtor will have the authority to file objections to Claims and to settle, compromise, withdraw,

or litigate to judgment objections to Claims regardless of whether the Claims were filed before or

after the Effective Date, including Administrative Expense Claims, and Professional

Compensation and Reimbursement Claims.  From and after the Effective Date, the Reorganized

Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

48051/0001-6285623v9

2.     **Allowance Of Claims; No Distribution Pending Allowance.**  Except as

expressly provided herein or in any order entered in the Chapter 11 Case prior to the Effective

Date (including the Confirmation Order), no Claim will be deemed Allowed, unless and until

such Claim is deemed Allowed under the Bankruptcy Code or the Bankruptcy Court enters a

Final Order in the Chapter 11 Case allowing such Claim.  Except as expressly provided in this

Plan or in any Order entered in the Chapter 11 Case prior to the Effective Date (including the

Confirmation Order), the Reorganized Debtor on and after the Effective Date will have and

retain any and all rights and defenses the Debtor had with respect thereto as of the

Commencement Date.

Notwithstanding anything to the contrary contained in the Plan, no payments or

distributions, if any contemplated by the Plan, will be made with respect to all or any portion of a

Disputed Claim unless and until all objections to such Disputed Claim have been settled or

withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion

thereof, has become an Allowed Claim.

3.     **Distributions After Allowance.**  To the extent that a Disputed Claim

ultimately becomes an Allowed Claim, a distribution, if any, will be made to the holder of such

Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable

after the date that the order or judgment of the Bankruptcy Court or other applicable court of

competent jurisdiction allowing any Disputed Claim becomes a Final Order, or the date upon

which other final resolution has been reached to Allow such Claim, the Disbursing Agent will

provide to the holder of such Claim the distribution to which such holder is entitled under the

Plan.  Notwithstanding the foregoing, the Disbursing Agent will not be required to make

distributions more frequently than once every 90 days.

**4.        Controversy Concerning Impairment.**  If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, is Impaired under this Plan, the Bankruptcy Court will, after notice and a hearing, determine such controversy at or before the Confirmation Date.

**5.        Reservation of Rights to Object to Allowance or Asserted Priority of Claims.**  Nothing herein will waive, prejudice or otherwise affect the rights of the Debtor, the Reorganized Debtor to object at any time, including after the Effective Date, to the allowance or asserted priority of any Claim, other than with respect to Claims that are deemed Allowed pursuant to Article II of the Plan.

**F.        Treatment of Executory Contracts and Unexpired Leases**

**1.        Assumption and Assignment of Executory Contracts and Unexpired Leases.**  Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the Lease Agreement will be deemed assumed by the Debtor and assigned to the Reorganized Debtor as of the Effective Date.  The Debtor reserves the right, at any time prior to the Confirmation Date, to seek to assume any Executory Contract or unexpired lease to which the Debtor is a party.  The Confirmation Order will constitute an Order of the Bankruptcy Court approving the assumption and assignment of the contract and lease assumptions described above as of the Effective Date. Upon the Effective Date, the counter party to the Lease Agreement will be deemed to have consented to the assumption of the Lease Agreement contemplated by Bankruptcy Code section 365(c)(1)(B), to the extent such consent is necessary for such assumption.

**2.        Cure of Defaults Under Assumed Executory Contracts and Unexpired Leases.**  Except as may otherwise be agreed to by the parties, within ninety days after the Effective Date, or as due in the ordinary course of business, the Reorganized Debtor will cure any and all undisputed defaults under the Lease Agreement and any other assumed Executory Contracts and unexpired leases in accordance with section 365(b)(1) of the Bankruptcy Code.

52

Notice of the cure amount for the Lease Agreement is set forth on Schedule 1 to the Plan.

Notwithstanding the foregoing, in the event of a dispute regarding (i) the nature or amount of any

cure obligation, (ii) the ability of the Debtor or any assignee to provide "adequate assurances of

future performance" (within the meaning of section 365 of the Bankruptcy Code) under the

Lease Agreement, or (iii) any other matter pertaining to any such assumption, the cure obligation

will be satisfied no later than thirty (30) days of the entry of a Final Order determining the

obligation, if any, of the Debtor with respect thereto, or as may otherwise be agreed to by the

parties.

The Plan and Schedule 1 will constitute notice to the non-Debtor counterparty to the

Lease Agreement of the amount of any cure amount owed, if any, under the Lease Agreement.  If

said non-Debtor counterparty fails to respond or object on or before the deadline scheduled by

the Bankruptcy Court for objections to the Plan, it will be deemed to have consented to such

proposed cure amount for all purposes in the Chapter 11 Case.

3. **Insurance Policies.**  All of the Debtor's insurance policies and any

agreements, documents, or instruments relating thereto (collectively, the "Insurance Policies"),

are treated as Executory Contracts under the Plan.  On the Effective Date, the Reorganized

Debtor will be deemed to have assumed all insurance policies and any agreements, documents,

and instruments relating to coverage of Claims covered by those insurance policies, subject to all

rights, remedies and defenses of the Debtor under any agreements, insurance policies and

applicable law.  Nothing in the Plan, or in any Order confirming the Plan, will preclude plaintiffs

in pending litigation matters from pursuing their claims against the Debtor solely to the extent of

available insurance coverage and proceeds.  Claims against the Debtor, to the extent of available

insurance, are preserved and not discharged by the Plan.  Nothing contained in this Article will

48051/0001-6285623v9

constitute or be deemed a waiver of any Cause of Action that the Debtor may hold against any entity including, without limitation, the insurer under any of the Debtor's Insurance Policies.

4.    **Indemnification Obligations.**  For purposes of the Plan, the obligations of the Debtor to defend, indemnify, reimburse or limit the liability of any present member, manager, director, officer or employee who is or was a member, manager, director, officer or employee, respectively, on or after the Commencement Date against any Claims or obligations pursuant to the Debtor's operating agreement, certificate of formation or similar corporate governance documents, applicable state law, or specific agreement, or any combination of the foregoing (collectively, the "Indemnification Obligations"), will: (i) survive confirmation of the Plan; (ii) remain unaffected thereby; and (iii) not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Commencement Date.  To the extent provided in this section, such obligations will be deemed and treated as Executory Contracts to be assumed by the Reorganized Debtor hereunder on the Effective Date and will continue as obligations of the Reorganized Debtor following the Effective Date.  Upon the Effective Date, except with respect to causes of action arising under Chapter 5 of the Bankruptcy Code, or in the case of gross negligence, willful misconduct or fraud, the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liability subject to indemnification by the Debtor or the Reorganized Debtor will be enjoined.

5.    **Compensation and Benefit Plans.**  Except as otherwise expressly provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, all of the Debtor's programs, plans, agreements and arrangements relating to employee compensation and benefits, including

54

programs, plans, agreements and arrangements subject to sections 1114 and 1129(a)(13) of the

Bankruptcy Code, entered into before the Commencement Date and not since terminated

(collectively, the "Compensation and Benefit Plans"), will be deemed to be, and will be treated

as though they are, executory contracts that are assumed under Article VII. of the Plan, and the

Debtor's obligations under such programs, plans, agreements and arrangements will survive

confirmation of the Plan, except for executory contracts or plans that previously have been

rejected, are the subject of a motion to reject or have been specifically waived by the

beneficiaries of any plans or contracts.

**6.     Rejection of Executory Contracts and Unexpired Leases.**  On the

Effective Date, all Executory contracts and unexpired leases will be deemed rejected, other than:

(i) the Lease Agreement, (ii) the Insurance Policies, (iii) the Indemnification Obligations, (iv)

the Compensation and Benefit Plans and (v) any other Executory contracts and unexpired leases

that the Debtor seeks to assume prior to the Confirmation Date.  The Confirmation Order will

constitute an order approving such rejection as of the Effective Date.

**7.     Deadline for Filing Proofs of Claim Relating to Executory Contracts

and Unexpired Leases Rejected Pursuant to the Plan.**  If the rejection by the Debtor, pursuant

to the Plan or otherwise, of an Executory Contract or unexpired leases gives rise to a Claim, a

Proof of Claim must be filed with the Bankruptcy Court and served upon the Clerk and the

Debtor's counsel or as otherwise may be provided in the Confirmation Order, by no later than

thirty (30) days after the later of (i) notice of entry of the Confirmation Order and (ii) other

notice that the Executory Contract or unexpired lease has been rejected.  Any Proofs of Claim

not filed and served within such time periods will be forever barred from assertion against the

Debtor, the Reorganized Debtor, the Estate and their property.  Unless otherwise Ordered by the

48051/0001-6285623v9

Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and unexpired leases will be treated as General Unsecured Claims under the Plan.

### G. Conditions to Confirmation and Effectiveness of the Plan

#### 1. Conditions to Confirmation.

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be waived or satisfied in accordance with Section 10.4 of the Plan:

(i)      An Order will have been entered finding that:

(a)      the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy will have been issued by the Bankruptcy Court; and

(b)      the Debtor, the Creditors' Committee and their respective principals, officers, directors, attorneys, accountants, financial advisors, advisory affiliates, employees, and agents solicited acceptance or rejection of the Plan in good faith pursuant to 11 U.S.C. § 1125(e); and

(c)      the proposed Confirmation Order will be in form and substance reasonably satisfactory to the Debtor and will have been signed by the Bankruptcy Court and entered on the docket of this Chapter 11 Case.

#### 2. Conditions Precedent to the Effective Date. The following are conditions precedent to the Effective Date, each of which must be satisfied or waived in accordance with section 10.4 of the Plan:

(a)      The Confirmation Order will authorize and direct that the Debtor and the Creditors' Committee take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases and other agreements or documents created in connection with the Plan, including the Plan Documents and the transactions contemplated thereby.

(b)      The Confirmation Order will have become a Final Order.

(c)     The Statutory Fees owing to the United States Trustee will have been paid in full.

(d)     All other actions, authorizations, consents and regulatory approvals required (if any) and all Plan Documents necessary to implement the provisions of the Plan will have been obtained, effected or executed in a manner acceptable to the Debtor or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

### H.    Retention of Jurisdiction

The Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)     To hear and determine all matters with respect to the assumption or rejection of any Executory Contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(b)     To hear and determine any and all adversary proceedings, applications, motion and contested or litigated matters arising out of, under or relate to, the Chapter 11 Case, including, without limitation, the Fifth Third Claim Litigation;

(c)     To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

(d)     To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(e)     To issue such Orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)    To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)    To hear and determine all Professional Compensation and Reimbursement Claims and other Administrative Expense Claims;

(h)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(i)    Except as otherwise limited herein, to recover all assets of the Debtor and property of the Debtor's Estate, wherever located;

(j)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)    To hear any other matter not inconsistent with the Bankruptcy Code;

(l)    To enter a final decree closing the Chapter 11 Case;

(m)    To ensure that Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

(n)    To decide or resolve any motions, adversary proceedings, contested or litigated matters pending in the Bankruptcy Court and any other matters pending in the Bankruptcy Court and grant or deny any applications involving the Debtor that may be pending in the Bankruptcy Court on the Effective Date;

(o)    To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

58

(p)    To determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Plan Documents;

(q)    To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

(r)    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

(s)    To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the General Bar Dates, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the Plan for the purpose of determining whether a Claim or Equity Interest is discharged hereunder or for any other purpose.

## I.    **Releases and Related Provisions**

**1.    Releases by the Debtor.**  Upon substantial consummation and then effective nunc pro tunc to the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Reorganized Debtor and any Entity seeking to exercise the rights of the Debtor's estate, including, without limitation, any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever in connection with or related to the Debtor, the conduct of the Debtor's business, the Chapter 11

59

Case or the Plan (other than the rights of the Debtor and the Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Reorganized Debtor, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtor, the Estate, or the Reorganized Debtor against (i) the Debtor, (ii) any of the present or former shareholders, members, directors, officers, employees or advisors of the Debtor, (iii) any Professionals of the Debtor, and (iv) the Creditors' Committee, its members, and its and their advisors, respectively (but not its members in their individual capacities); provided, however, that nothing in this Section 9.1 will be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, noncompete, or any other contractual or fiduciary obligation owed to the Debtor or the Reorganized Debtor.  As of the date of this Disclosure Statement, the Debtor has not conducted an investigation as to any potential claims and causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code) the Debtor, the Estate, or the Reorganized Debtor may have against any of the present or former shareholders, members, directors, officers, employees or advisors of the Debtor.

**2.** **Releases by Holders of Claims and Equity Interests.**  Upon substantial consummation and then effective nunc pro tunc to the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim and/or Equity

60

Interest that receives a Distribution pursuant to the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the present or former shareholders, members, directors, officers, employees or advisors of the Debtor (collectively, the "Releasees"), in connection with or related to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, or the Plan; provided, however, that Fifth Third will not be deemed to release Zayat on account of the Zayat Guaranty or Pioneer on account of the Pioneer Guaranty.  As of the date of this Disclosure Statement, the Debtor has not conducted an investigation as to any potential claims and causes of action a Holder of a Claim and/or Equity Interest may have against the present or former shareholders, members, directors, officers, employees or advisors of the Debtor.

Each of the Releasees will be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, or the Plan, that such Releasees may hold in their individual capacities against each Holder of a Claim and/or Equity Interest that receives a Distribution pursuant to the Plan; provided, however, that until the conclusion of the

Fifth Third Claim Litigation, Fifth Third will not be released by the Releasees on any claim

raised or which could be raised as part of the Fifth Third Claim Litigation.

### 3.   Temporary Injunction

On and after the Confirmation Date, all entities, creditors and equity and/or

interest holders who have held, hold or may hold Claims against or Equity Interests in the

Debtor, will be temporarily enjoined, pursuant to section 105 of the Bankruptcy Code,

from proceeding against any officer, director, shareholder, employee, or other responsible

party of the Debtor, individually, including, but not limited to, Zayat and Pioneer, for the

collection of all or any portion of their Allowed Claim or Allowed Equity Interest, said

injunction to remain in effect only for so long as the Debtor complies with the terms of

the Plan.  Any violation of the Plan that remains uncured for thirty (30) days after receipt

by the Debtor of written notice from any party affected by such violation, will

automatically and without order of the Bankruptcy Court result in the dissolution of the

injunction granted hereunder as to said affected party.

Notwithstanding the foregoing, the injunction granted hereunder will not affect the claims

and rights of Fifth Third to proceed against Zayat for collection on the Zayat Guaranty or Pioneer

for collection on the Pioneer Guaranty; provided, however, so long as the Debtor is not in default

under the Plan on any required payment to Fifth Third beyond any relevant grace period, Fifth

Third is temporarily enjoined hereunder from proceeding against (i) Zayat for collection of any

amounts paid or to be paid by Zayat under the Zayat Guaranty or by the Debtor or Reorganized

Debtor under the Plan or (ii) Pioneer for collection of any amounts paid or to be paid by Pioneer

under the Pioneer Guaranty or by the Debtor or Reorganized Debtor under the Plan.

Notwithstanding anything contained herein to the contrary, the exclusive remedy for

payment of any claim or debt so long as the Plan is not in default will be the Plan.

62

### J.       Summary of Other Provisions of the Plan

**1.       Administrative Expense Claims Bar Date.**  All Administrative Expense

Claims will be filed with the Bankruptcy Court and served on counsel for the Debtor no later

than the Administrative Expense Claims Bar Date.  In the event that the Debtor or Reorganized

Debtor objects to an Administrative Expense Claim, the Bankruptcy Court will determine the

Allowed amount of such Administrative Expense Claim.  Notwithstanding the foregoing, (a) no

application seeking payment of Postpetition Administrative Trade Claim need be filed with

respect to an undisputed postpetition obligation which was paid or is payable by a Debtor in the

ordinary course of business; provided, however, that in no event will a postpetition obligation

that is contingent or disputed and subject to liquidation through pending or prospective litigation,

including, but not limited to, obligations arising from personal injury, property damage, products

liability, consumer complaints, employment law (excluding claims arising under workers'

compensation law), secondary payor liability, or any other disputed legal or equitable claim

based on tort, statute, contract, equity, or common law, be considered to be an obligation which

is payable in the ordinary course of business; and (b) no application seeking payment of an

Administrative Expense Claim need be filed with respect to Cure owing under an executory

contract or unexpired lease if the amount of Cure is fixed by order of the Bankruptcy Court.

**2.       Amendment or Modification of the Plan.**  The Debtor may alter, amend

or modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy

Code at any time prior to the Confirmation Date.  The Debtor reserves the right to include any

amended exhibits or schedules in the Plan Supplement.  After the Confirmation Date and prior to

substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the

Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the

Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan,

the Disclosure Statement or the Confirmation Order, and to accomplish such matters as may be

necessary to carry out the purposes and effects of the Plan so long as such proceedings do not adversely affect the treatment of holders of Claims under the Plan; provided, however, that prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

       **3.**       **Termination of Creditors' Committee.**  The appointment of the Creditors' Committee will terminate on the Effective Date for all purposes other than making a motion to reopen the Chapter 11 Case to pursue Avoidance Actions, if necessary.

       **4.**       **Corporate Action.**  Prior to, on or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the interest holders or managers of the Debtor will be deemed to have occurred and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable General Corporation Law of the State of Delaware without any requirement of further action by the interest holders or managers of the Debtor.

       **5.**       **Post-Effective Date Fees and Expenses.**  From and after the Effective Date, the Reorganized Debtor will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court pay the reasonable fees and expenses of Professionals thereafter incurred by the Debtor and the Reorganized Debtor, as the case may be, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

       **6.**       **Payment of Statutory Fees.**  All fees payable pursuant to section 1930 of the Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid in Cash equal to the amount of such fees on the Effective Date.  The Reorganized Debtor will timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree

64

closing the Chapter 11 Case, or enters an Order either converting this case to a case under

Chapter 7 or dismissing this case.

7.      **Severability of Plan Provisions.**  If, prior to the Confirmation Date, any

term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or

unenforceable, the Bankruptcy Court, at the request of the Debtor, will have the power to alter

and interpret such term or provision to make it valid or enforceable to the maximum extent

practicable, consistent with the original purpose of the term or provision held to be invalid, void

or unenforceable, and such term or provision will then be applicable as altered or interpreted.

Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and

provisions of the Plan will remain in full force and effect and will in no way be affected,

impaired or invalidated by such holding, alteration or interpretation.

8.      **Revocation or Withdrawal of the Plan.**  The Debtor reserves the right to

revoke or withdraw the Plan before the Confirmation Date.  If the Debtor revokes or withdraws

the Plan before the Confirmation Date, then the Plan will be deemed null and void.  In such

event, nothing contained herein will constitute or be deemed a waiver or release of any Claims

by or against, or any Equity Interests in, the Debtor, or any Avoidance Actions or Causes of

Action or other claims by or against the Debtor, the Creditor's Committee, or any Person or

Entity or to prejudice in any manner the rights of the Debtor or any Person in any further

proceedings involving the Debtor.

9.      **Successors and Assigns and Binding Effect.**  The rights, benefits, and

obligations of any Person or Entity named or referred to in the Plan will be binding on, and will

inure to the benefit of, any heir, executor, administrator, personal representative, successor, or

assign of such Person or Entity, including, but not limited to, the Reorganized Debtor and all

other parties-in-interest in the Chapter 11 Case.

48051/0001-6285623v9

10.     **Prepayment.**  Except as otherwise provided in the Plan or the

Confirmation Order, the Debtor will have the right to prepay, without penalty, all or any portion

of an Allowed Claim upon authorization of the Bankruptcy Court; provided, however, that any

such prepayment will not be violative of, or otherwise prejudice, the relative priorities and

parities among the Classes of Claims.

11.     **Notices.**  All notices, requests and demands to or upon the Debtor to be

effective will be in writing and, unless otherwise expressly provided herein or in the Plan, will be

deemed to have been duly given or made when actually delivered or, in the case of notice by

facsimile transmission, when received and telephonically confirmed, addressed as follows:

|  |  |
|---|---|
| If to the Debtor: | Zayat Stables, LLC<br>401 Hackensack Avenue<br>Hackensack, New Jersey 07601<br>Attention: Mr. Ahmed Zayat |
| with copies to: | Cole, Schotz, Meisel,<br>Forman & Leonard, P.A.<br>25 Main Street<br>P.O. Box 800<br>Hackensack, NJ 07602-0800<br>Attn:   Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Telephone:  (201) 489-3000<br>Facsimile:  (201) 489-1536 |
| If to the Creditors' Committee: | Peter Belanto<br>Chair of Creditors' Committee<br>Mike Mitchell Racing Stable<br>28202 Palmada<br>Mission Viejo, CA 92692<br>Telephone:  (949) 830-7027<br>Facsimile:  (949) 830-6448 |

48051/0001-6285623v9

with copies to:          Porzio Bromberg & Newman P.C.
                         100 Southgate Parkway
                         Morristown, NJ 07960-6465
                         Attn:  John Mairo, Esq.
                         Warren Martin, Esq.
                         Telephone:  (973) 538-4006
                         Facsimile:  (973) 538-5146

12.     **Governing Law.**  Except to the extent the Bankruptcy Code, Bankruptcy

Rules or other federal law is applicable, or to the extent an exhibit to the Plan provides

otherwise, the rights and obligations arising under the Plan will be governed by, and construed

and enforced in accordance with, the laws of the State of New Jersey, without giving effect to the

principles of conflicts of law of such jurisdiction.

13.     **Plan Supplement.**  Forms of all material agreements or documents related

to any the Plan, including but not limited to those identified in this Plan, will be contained in the

Plan Supplement.  The Plan Supplement will be filed by the Debtor with the Clerk of the

Bankruptcy Court no later than five (5) days before the Voting Deadline and may be modified

thereafter.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in

the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims, or

Equity Interest may obtain a copy of the Plan Supplement upon written request to the Debtor's

counsel.

14.     **Section 1145 Exemption.**  Pursuant to section 1145(a) of the Bankruptcy

Code, the offer, issuance, transfer or exchange of any security under the Plan, or the making or

delivery of an offering memorandum or other instrument of offer or transfer under the Plan, will

be exempt from Section 5 of the Securities Act of 1933 or any similar state or local law requiring

the registration for offer or sale of a security or registration or licensing of an issuer or a security.

48051/0001-6285623v9

## V.    <u>VOTING AND CONFIRMATION PROCEDURES</u>

The following is a brief summary regarding the acceptance and confirmation of the Plan.  Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.  Additional information regarding voting procedures is set forth in the notice accompanying this Disclosure Statement.

### A.    <u>Voting Instructions</u>

A Ballot to be used for voting on the Plan is being distributed to Holders of Claims in the Voting Classes.  Only Holders in the Voting Classes are entitled to vote to accept or reject the Plan and may do so by completing the Ballot and returning to the address provided below.  **<u>Please carefully review the instructions enclosed with the Ballot prior to voting.</u>**  It is important for all Creditors that are entitled to vote on the Plan to exercise their right to vote to accept or reject the Plan.  Even if you do not vote to accept the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims and confirmed by the Bankruptcy Court.

BALLOTS CAST BY HOLDERS IN THE VOTING CLASSES MUST BE RECEIVED BY DEBTOR'S COUNSEL BY 5:00 P.M.  (PREVAILING EASTERN TIME) ON JULY 12, 2010 AT THE FOLLOWING ADDRESS:

>Zayat Stables, LLC Ballot Processing
>c/o Cole, Schotz, Meisel, Forman & Leonard, P.A.
>Attn: Ryan T. Jareck
>Court Plaza North
>25 Main Street
>Hackensack, NJ 07601

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.  IF YOU HAVE ANY QUESTIONS ON VOTING PROCEDURES THAT DO NOT REQUIRE THE PROVISION OF LEGAL ADVICE PLEASE CALL DEBTOR'S COUNSEL, RYAN T. JARECK, AT (201) 489-3000.

48051/0001-6285623v9

By signing and returning a Ballot, each Holder of a Claim in a Voting Class also will be acknowledging and/or certifying to the Debtor and to the Bankruptcy Court that, among other things that (i) he/she/it has been provided with a copy of the Disclosure Statement, (ii) as of the Record Date, he/she/it is the holder of a Claim in the applicable Class or the authorized agent of such a holder and (iii) he/she/it has full power and authority to vote to accept or reject the Plan.

## B.    **Proposed Procedure for Tabulating Votes**

Solely for the purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a claim, and without prejudice to the rights of the Debtor in any other context, the Debtor will propose that each holder of a claim that is entitled to vote to accept or reject the Plan be entitled to vote the liquidated, non-disputed, non contingent amount of such claim as set forth on the Schedules unless such holder has timely filed a proof of claim, in which event such holder would be entitled to vote the amount of such claim as set forth in such proof of claim.  The foregoing general procedure will be subject to the following exceptions:

(a)    if a claim for which a proof of claim has been timely filed is, by its terms, contingent or unliquidated in whole or in part, subject to paragraph (e) below, such claim is accorded one (1) vote valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution;

(b)    if a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim is temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

(c)    if a claim is listed in the Schedules and a proof of claim subsequently was filed in an amount that is liquidated, non-contingent and undisputed, such claim is temporarily allowed in the amount set forth on the proof of claim, unless such claim is disputed as set forth in subparagraph (e) below;

69

(d)      if a claim is listed in the Schedules as contingent or unliquidated and a proof of claim was not (i) filed by the applicable bar date for the filing of proofs of claim established by the Court or (ii) deemed timely filed by an Order of the Court prior to the Voting Deadline, unless the Debtor has consented in writing, such claim is disallowed for voting purposes;

(e)      (i) if a claim is listed in the Schedules as disputed, (ii) if a claim for which a proof of claim has been timely filed is disputed, or (iii) if the Debtor has served an objection, complaint or request for estimation as to a claim at least ten (10) days before the Voting Deadline, such claim will be disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection, complaint or request for estimation;

(f)      each entity that holds or has filed more than one (1) unsecured claim against the Debtor will not be entitled to aggregate such unsecured claims for purposes of voting, classification and treatment under the Plan;

(g)      notwithstanding anything herein to the contrary, the Debtor's counsel, in its discretion, may contact voters to cure any defects in the Ballot and are authorized to so cure any defects; and

(h)      there will be a rebuttable presumption that any claimant who submits a properly completed superseding Ballot or withdrawal of Ballot on or before the Voting Deadline has sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's acceptance or rejection of the Plan.

## C.      <u>Voting Record Date</u>

The Voting Record Date for purposes of determining which Holders of Claims are entitled to vote on the Plan is June 9, 2010.  As of the close of business on the Voting Record Date, the claims' register will be closed, and there will be no further changes in the record

70

Holders of any Claims.  The Debtor will not have any obligation to recognize any transfer of any Claims occurring after the Voting Record Date.  The Debtor will instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the claims' register as of the close of business on the Voting Record Date.

### D.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for July 15, 2010, at 10:00 a.m. (prevailing Eastern Time) before the Honorable Donald H. Steckroth, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Martin Luther King, Jr. Federal Building, 50 Walnut Street, 3rd Floor, Newark, New Jersey 07102, Courtroom 3B.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Objections to confirmation of the Plan must be filed and served on or before July 8, 2010, at 5:00 p.m. (prevailing Eastern Time) (the "Plan Objection Deadline") in accordance with the Confirmation Hearing notice served on you.  Any objection must, among other things,  (i) be made in writing; (ii) specify in detail the name and address of the objector, (iii) specify all grounds for the objection and (iv) specify the amount of the Claim or Equity Interest held by the objector.  Any such objection must be filed with the Bankruptcy Court and served on the Debtor's counsel and all parties who have filed a notice of appearance by 5:00 p.m. prevailing Eastern Time on July 8, 2010.

48051/0001-6285623v9

UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED

IN COMPLIANCE WITH THE PROCEDURES SET FORTH IN THE CONFIRMATION

HEARING NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### E.    Additional Information

Any questions regarding voting procedures or a request for an additional copy of the

Disclosure Statement, the Plan, or any exhibits to such documents should be directed to the

Debtor's counsel (a) via e-mail at fpisano@coleschotz.com; (b) via mail at Court Plaza North, 25

Main Street, Hackensack, NJ 07601; (c) via telephone at (201) 489-3000; and (d) via facsimile at

(201) 489-1536.

### VI.    REQUIREMENTS FOR CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will determine whether the

requirements of section 1129 of the Bankruptcy Code have been satisfied with respect to the

Plan, in which event the Bankruptcy Court will enter an order confirming the Plan.

The Debtor believes that the Plan satisfies all of the statutory requirements for

confirmation and, prior to the Confirmation Hearing, will submit pleadings and evidence

demonstrating that the Plan complies with such requirements.  The following subsections discuss

some of the most important requirements of section 1129(a) of the Bankruptcy Code.

### A.    Acceptances Necessary to Confirm Plan

As a condition to confirmation of the Plan, the Bankruptcy Code requires each Class of

Impaired Claims to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of

impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more

than one-half (1/2) in number of claims in that class, but for that purpose counts only those who

actually vote to accept or to reject the Plan.  Thus, holders of Claims in each of the Voting

Classes will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in

48051/0001-6285623v9

number of the Claims actually voting in each Class cast their ballots in favor of acceptance.

Holders of Claims who fail to vote are not counted as either accepting or rejecting a Plan.

Holders of Claims in Classes 1, 5 and 7 are conclusively presumed to have accepted the

Plan and thus are not entitled to vote.

### B.    Feasibility of the Plan

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that

confirmation of the Plan is not likely to be followed by the liquidation or the need for further

reorganization of the Debtor.  This requirement is commonly referred to as "feasibility."

To support its belief in the feasibility of the Plan, the Debtor has relied upon the

Projections, which are annexed to this Disclosure Statement as **Appendix C**.  The Projections

were reviewed by the Debtor's financial advisor, J.H. Cohn.  At the request of the Debtor and

J.H. Cohn, EQB, Inc. prepared a report that assessed the reasonableness of the projected sales of

horses, racing income and stud fee income.

The Projections indicate that the Reorganized Debtor should have sufficient cash flow to

pay and service its debt obligations and to fund its operations.  The proceeds from the

Eskendereya Sale were consistent with the projected sales of horses in 2010.  Accordingly, the

Debtor believes that the Plan satisfies the feasibility requirement.

The Projections cover the operations of the Reorganized Debtor through calendar year

2014.  The Projections are based on numerous assumptions, including confirmation and

consummation of the Plan in accordance with its terms; realization of the operating strategy of

the Reorganized Debtor; industry performance; no material adverse changes in applicable

legislation or regulations, or the administration thereof, or generally accepted accounting

principles; no material adverse changes in general business and economic conditions; no material

adverse changes in competition; the Reorganized Debtor's retention of key management and

other key employees; the absence of material contingent or unliquidated litigation, indemnity, or

73

other claims; and other matters, many of which will be beyond the control of the Reorganized

Debtor and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future

business decisions and objectives, they are subject to change.  In addition, although they are

presented with numerical specificity and are based on assumptions considered reasonable by the

Debtor, the assumptions and estimates underlying the Projections are subject to significant

business, economic, and competitive uncertainties and contingencies, many of which will be

beyond the control of the Reorganized Debtor.  Accordingly, the Projections are only estimates

and are necessarily speculative in nature.  It can be expected that some or all of the assumptions

in the Projections will not be realized and that actual results will vary from the Projections,

which variations may be material and are likely to increase over time.  In light of the foregoing,

readers are cautioned not to place undue reliance on the Projections.  The Projections were not

prepared in accordance with standards for projections promulgated by the American Institute of

Certified Public Accountants or with a view to compliance with published guidelines of the SEC

regarding projections or forecasts.  The Projections have not been, audited, reviewed, or

compiled by the any independent public accountants.  The projected financial information

contained in this Disclosure Statement should not be regarded as a representation or warranty by

the Debtor, the Debtor's advisors, or any other Person that the Projections can or will be

achieved.

The Projections should be read together with the information in Article VII. of this

Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth

important factors that could cause actual results to differ from those in the Projections.

The Debtor does not intend to update or otherwise revise the Projections, including any

revisions to reflect, events or circumstances existing or arising after the date of this Disclosure

48051/0001-6285623v9

Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition.  Furthermore, the Debtor does not intend to update or revise the Projections to reflect changes in, general economic or industry conditions.

The Debtor will face a number of risks with respect to its continuing business operations upon emergence from Chapter 11, including but not limited to the following:  the Debtor's ability to improve profitability and generate positive operating cash flow; the overall condition of the equine industry and its effect on horse prices; the Debtor's ability to increase capital expenditures in the future; potential changes in federal, state or local laws or regulations; and changes in accounting standards, taxation requirements and bankruptcy laws.

## C.  <u>Best Interests Test</u>

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

75

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 Case.  Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtors in its Chapter 11 Case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the Chapter 11 Case.  The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business.  Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests.  The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

### D.    Liquidation Analysis

A liquidation analysis prepared with respect to the Debtor is attached as **Appendix D** to this Disclosure Statement.  The Debtor believes that any liquidation analysis is speculative.  For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which

76

will ultimately become Allowed Claims.  This estimate is based solely upon the Debtor's review

of the Debtor's books and records and Claims filed as of the date of the Disclosure Statement.

Because bar dates for the Claims have not passed, the Debtor has not been able to complete its

analysis of Claims in the Chapter 11 Case.  No order or finding has been entered by the

Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts

of Allowed Claims set forth in the liquidation analysis.  The estimate of the amount of Allowed

Claims set forth in the liquidation analysis should not be relied on for any other purpose,

including, without limitation, any determination of the value of any distribution to be made on

account of Allowed Claims under the Plan.

The Debtor believes the methodology used to prepare the liquidation analysis attached

hereto as **Appendix D** is appropriate and that the assumptions and conclusions set forth therein

are fair and reasonable under the circumstances and represent a reasonable exercise of the

Debtor's business judgment with respect to such matters.

E.     **Application of the "Best Interests Test" to the Liquidation Analysis**

Notwithstanding the difficulties in quantifying recoveries to creditors with

precision, the Debtor believes that taking into account the liquidation analysis, the Plan meets the

"Best Interests Test" of Bankruptcy Code section 1129(a)(7).  The Debtor believes that the

holders of Claims in Impaired Classes will receive at least as much under the Plan than they

would in a liquidation in a hypothetical Chapter 7 case.  Creditors will receive a better recovery

through the distributions contemplated by the Plan because the continued operation of the Debtor

as a going concern rather than a forced liquidation will allow realization of more value for the

Debtor's assets.  Moreover, as a result of the reorganization of the Debtor, creditors such as the

Debtor's employees and service providers would retain their jobs and relationships with the

Debtor, as applicable, and most likely make few if any other claims against the estate.  Lastly, in

the event of liquidation, the aggregate amount of unsecured claims which would receive no

distribution would no doubt increase significantly. All of these factors lead to the conclusion that recoveries under the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a Chapter 7 liquidation.

**F.    Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

The Plan may be confirmed, even if it is not accepted by all of the Impaired Classes, if the Debtor shows that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to each Impaired Class that has rejected the Plan and at least one Impaired Class has accepted the Plan. Provision for such confirmation is set forth in section 1129(b) of the Bankruptcy Code and is commonly referred to as "cramdown." The cramdown provisions are complex and this summary is not intended to be a complete statement of the law in this area. The Debtor will seek to confirm the Plan notwithstanding the nonacceptance or deemed nonacceptance of the Plan by any Impaired Class of Claims.

**1.    No Unfair Discrimination**

A plan "does not discriminate unfairly" if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class.

The Debtor believes that under the Plan: (i) all Impaired Classes of Claims are treated in a manner that is consistent with the treatment of other Classes of Claims with which their legal rights are similar, if any, and (ii) no Class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such Class. Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any Impaired Class.

48051/0001-6285623v9

### 2. Fair and Equitable Test

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims, and interests as follows:

### a.    Secured Claims

The fair and equitable test for secured claims, which is applicable to Class 2, Class 3, Class 4 and Class 5, is that the plan provides: (i) that the holders of secured claims retain the liens in the property securing such claims to the extent of the allowed amount of such claims, and receive on account of such claims deferred cash payments totaling at least the allowed amount of such claims, of a value, as of the effective date of the plan, of at least the value of such holders' interest in the estate's interest in such property; (ii) for the sale of any property subject to the liens securing such claims, free and clear of such liens, with the liens attaching to the proceeds of such sale, and such liened proceeds being treated either pursuant to (i) or (iii); or (iii) for the realization by such holders of the indubitable equivalent of such claims.

The treatment proposed for Class 2, Class 3, Class 4, and Class 5 satisfies the fair and equitable test and can be crammed down, if necessary.

### b.    Unsecured Claims

The fair and equitable test for unsecured claims, which is applicable to Class 6, is that the plan provides: (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.  The latter requirement is known as the "absolute priority rule" and a plan that violates the absolute priority rule per se is not "fair and equitable" and cannot be confirmed.

48051/0001-6285623v9

However, courts recognize a "new value" exception to the absolute priority rule, which provides that even if unsecured creditors are not paid in full, equity may receive or retain property under the plan if it makes a contribution of "new value." A contribution sufficient to overcome the absolute priority rule must be: (i) in the form of money or money's worth; (ii) reasonably equivalent to the interest retained or received by the equity holders; and (iii) necessary for the debtor's reorganization.

Here, in light of the substantial new value contribution by the Holder of Class 7 Equity Interests in the form of forgiveness of various General Unsecured Claims and Administrative Expense Claims, the new value exception to the absolute priority rule is satisfied. Therefore, the treatment proposed for Class 7 satisfies the fair and equitable test and can be crammed down, if necessary.

### G. Other Requirements of Section 1129

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. If so, the Bankruptcy Court will enter the Confirmation Order. The Debtor believes that the Plan satisfies or will satisfy the applicable requirements, as follows:

• The Plan complies with the applicable provisions of the Bankruptcy Code.

• The Debtor, as Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

• The Plan has been proposed in good faith and not by any means forbidden by law.

• Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed

80

after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy

Court as reasonable.

• With respect to each Class of Impaired Claims, either each Holder of a Claim of

such Class has accepted the Plan, or will receive or retain under the Plan on account of such

Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount

that such Holder would receive or retain if the Debtor were liquidated on such date under

Chapter 7 of the Bankruptcy Code.

• Each Class of Claims that is entitled to vote on the Plan has either accepted the

Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each

voting Class pursuant to section 1129(b) of the Bankruptcy Code.

• Except to the extent that the Holder of a particular Claim will agree to a

different treatment of such Claim, the Plan provides that Allowed Administrative Expense

Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon

thereafter as practicable.

• At least one Class of Impaired Claims will accept the Plan, determined without

including any acceptance of the Plan by any insider holding a Claim of such Class.

• All fees of the type described in 28 U.S.C. § 1930, including the fees of the

United States Trustee, will be paid as of the Effective Date.

The Debtor believes that (a) the Plan satisfies or will satisfy all of the statutory

requirements of Chapter 11 of the Bankruptcy Code, (b) the Debtor has complied or will have

complied with all of the requirements of Chapter 11 and (c) the Plan has been proposed in good

faith.

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

The following is intended as a summary of certain material risks associated with the Plan.

The holders of Claims against the Debtor should read and carefully consider the following

48051/0001-6285623v9

factors, as well as the other information set forth in this Disclosure Statement and the Plan before

deciding whether to vote to accept or reject the Plan.  Furthermore, these risk factors should not

be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    <u>Certain Bankruptcy Considerations</u>

The Debtor cannot guarantee that it will secure confirmation of the Plan.  Even if

all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired

Class deemed to have rejected the Plan the requirements for "cramdown" are met, the

Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose

not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a

showing that confirmation of the Plan will not be followed by liquidation or the need for further

financial reorganization of the Debtor, <u>see</u> Article VI, Section B of this Disclosure Statement,

and that the value of distributions to dissenting holders of Claims will not be less than the value

such holders would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy

Code.  <u>See</u> Article VI, Section C of this Disclosure Statement.  Although the Debtor believe that

the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the

same conclusion.  <u>See</u> Appendix D for a liquidation analysis of the Debtor.

The Debtor's future results are dependent upon the successful confirmation and

implementation of a plan of reorganization.  Failure to obtain this approval in a timely manner

could adversely affect the Debtor's operating results, as the Debtor's ability to obtain financing

to fund its operations and its relations with Service Providers may be harmed by protracted

bankruptcy proceedings.  Furthermore, the Debtor cannot predict the ultimate amount of all

settlement terms for its liabilities that will be subject to a plan of reorganization.  Once a plan of

reorganization is approved and implemented, the Debtor's operating results may be adversely

affected by the possible reluctance of prospective lenders, and Service Providers to do business

with a company that recently emerged from a bankruptcy proceeding.

82

Furthermore, any objection to the Plan by a party-in-interest could either prevent, or delay for a significant period of time, confirmation of the Plan.

### B.    Inherent Uncertainty in Claims Estimation

There can be no assurance that any estimated Claim amounts in this Disclosure Statement are correct.  The number and amount of Claims estimated under the Plan could increase.  The Debtor and its advisors have estimated a certain dollar value of the Debtor's liabilities for purposes of allocating distributions to Holders of Claims under the Plan.  Although these are good faith estimates as of the date of the Plan, there can be no certainty that either unknown liabilities may arise or the aggregate value of liabilities may increase.  If the estimated value assumed by the Debtor underestimates actual liabilities or claims arise that result in an increase in the dollar value of the Debtor's aggregate liabilities, the level of recovery for Holders of Claims could be negatively impacted.

### C.    Inherent Uncertainty of Projections

The Projections set forth in the attached **Appendix C** cover the operations of the Reorganized Debtor through calendar year 2014.  These Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they

83

are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor.  Accordingly, the Projections are only estimates and are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.  The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants.  The Projections have not been audited, reviewed, or compiled by an independent public accountants.  The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors, or any other Person that the Projections can or will be achieved.

### D.   **Operational Risk Factors**

The Debtor faces a number of risks with respect to its continuing business operations, including but not limited to the following:  (i) its ability to improve profitability and generate positive operating cash flow; (ii) its ability to increase capital expenditures in the future; (iii) its ability to retain key personnel; (iv) the health and training of the thoroughbred race horses; and (v) changes in the equine industry and its effect on horse prices.

### E.   **Satisfaction of Conditions to Effective Date**

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the

84

Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be

consummated and the restructuring completed.

    **F.**    <u>**Leverage**</u>

        The Debtor believes that it will emerge from Chapter 11 with a reasonable level

of debt that can be effectively serviced in accordance with its business plan.  Circumstances,

however, may arise which might cause the Debtor to conclude that it is overleveraged, which

could have significant negative consequences, including:  (1) it may become more difficult for

the Reorganized Debtor to satisfy its obligations with respect to all of its obligations; (2) the

Reorganized Debtors may be vulnerable to a prolonged downturn in the market in which it

operates or a prolonged downturn in the economy in general; (3) the Reorganized Debtor may be

required to dedicate a substantial portion of its cash flow from operations to fund working

capital, capital expenditures, and other general corporate requirements; and (4) the Reorganized

Debtor may be limited in borrowing additional funds.

        Additionally, there may be factors beyond the control of the Reorganized Debtor

that could impact its ability to meet debt service requirements.  The ability of the Reorganized

Debtor to meet debt service requirements will depend on its future performance, which, in turn,

will depend on changes in the equine industry and the health and training of the Reorganized

Debtor's thoroughbred race horses and other factors that are beyond its control. The Debtor can

provide no assurance that the business of the Reorganized Debtor will generate sufficient cash

flow from operations or that future borrowings will be available in amounts sufficient to enable

the Reorganized Debtor to pay its indebtedness or to fund other liquidity needs.  Moreover, the

Reorganized Debtor may need to refinance all or a portion of its indebtedness on or before

maturity.  The Debtor cannot make assurances that the Reorganized Debtor will be able to

refinance any of its indebtedness on commercial reasonable terms or at all.  If the Reorganized

Debtor is unable to make scheduled debt payments or comply with the other provisions of its

48051/0001-6285623v9

debt instruments, its lenders will be permitted under certain circumstances to accelerate the

maturity of the indebtedness owing to them and exercise other remedies provided for in those

instruments and under applicable law.

### G.    Litigation

The Reorganized Debtor will be subject to various claims and legal actions arising

in the ordinary course of its businesses.  The Debtor is not able to predict the nature and extent of

any such claims and actions and cannot guarantee that the ultimate resolution of such claims and

actions will not have a material adverse effect on the Reorganized Debtor.

### H.    Certain Tax Considerations

There are a number of income tax considerations, risks, and uncertainties

associated with consummation of the Plan.  Interested parties should read carefully the

discussions set forth in Section VIII. of this Disclosure Statement regarding certain U.S. federal

income tax consequences of the transactions proposed by the Plan to the Debtor and the

Reorganized Debtor and to certain holders of Claims who are entitled to vote to accept or reject

the Plan.

## VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**IRS Circular 230 disclosure:  To ensure compliance with requirements imposed by the IRS, you are hereby notified that: (a) any discussion of U.S. federal tax issues in this Disclosure Statement (including all appendices thereto) is not intended or written be relied upon, and cannot be relied upon, by creditors for the purpose of avoiding penalties that may be imposed on such creditors under the Internal Revenue Code; (b) such discussion is not written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) each creditor should seek advice based on its particular circumstances from an independent tax advisor.**

### A.    General

The following discussion addresses certain United States federal income tax

consequences of the consummation of the Plan.  This discussion is based upon the Internal

Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed regulations

thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively.  No rulings or determinations by the Internal Revenue Service have been obtained or sought by the Debtor with respect to the Plan.

An opinion of counsel has not been obtained with respect to the tax aspects of the Plan. This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and financial institutions) or the state, local or foreign income and other tax consequences of the Plan.

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST.  SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO THE TAX ISSUES DISCUSSED BELOW.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### B.    Certain U.S. Federal Tax Consequences to the Debtor

The Debtor's business is operated through a limited liability company (the "LLC") which is owned 100% by Mr. Zayat.  Based upon discussions with the Debtor and J.H. Cohn, the LLC is a "disregarded entity" for income tax purposes and therefore, it pays no income tax and the income or loss passes through and is reported entirely on the 100% owner's individual tax return. To the best of our knowledge and upon information and belief, the LLC does not owe any income taxes, and there are no past due employment taxes or other ancillary taxes.  As a result of this structure, the Debtor does not anticipate any federal or state tax consequences associated with implementing the Plan.

87

C.      **Certain U.S. Federal Tax Consequences to the Holders of Claims and Equity Interests**

A Holder of an Allowed Claim or Equity Interest will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtor or included in income by the Holder of the Allowed Claim or Equity Interest.  A Holder of an Allowed Claim or Equity Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest.  The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received).  The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder of the Claim, the nature of the Claim or Equity Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim or Equity Interest.  If the Claim or Equity Interest in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss.  Such gain or loss will constitute long-term capital gain or loss if the Holder of the Claim is a non-corporate taxpayer and held such Claim or Equity Interest for longer than one year or short-term capital gain or loss if the Holder of the Claim held such Claim or Equity Interest for less than one year.

A Holder of an Allowed Claim or Equity Interest who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim or Equity Interest may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim or Equity Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the

88

Holder's trade or business.  A Holder that has previously recognized a loss or deduction in respect of its Claim or Equity Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim or Equity Interest.  Holders of Claims or Equity Interests who were not previously required to include any accrued but unpaid interest with respect to in their gross income on a Claim or Equity Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest.  Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

### D.    <u>Importance of Obtaining Professional Tax Assistance</u>

The foregoing is intended to be only a summary of certain of the United States federal income tax consequences of the Plan and not a substitute for careful tax planning with a tax professional.  Holders of Claims or Equity Interests are strongly urged to consult with their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the Plan, including, in addition to the issues discussed above, whether a bad debt deduction may be available with respect to their Claims and, if so, when such deduction or loss would be available.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD

48051/0001-6285623v9

CONSULT THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX

CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE

RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE,

LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX

LAWS.

IX.    **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN**

The Debtor believes that the Plan affords holders of Claims and Equity Interests

the greatest opportunity for recovery on account of their Claims and Equity Interests and,

therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the

hypothetical alternatives include (a) liquidation of the Debtor under Chapter 7 of the Bankruptcy

Code, or (b) an alternative plan of reorganization.

A.    **Liquidation under Chapter 7 or Chapter 11**

If no plan can be confirmed, the Chapter 11 Case could be converted to a case

under Chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the

remaining assets of the Debtor for distribution to the creditors in accordance with the priorities

established by the Bankruptcy Code.  The trustee would retain professionals and liquidate the

Debtor's remaining assets, and if necessary, investigate and pursue causes of action.  The Debtor

believes that the conversion of the case to Chapter 7 would increase the costs of administration,

and reduce and delay the distribution to holders of Allowed Claims.  Further, any proceeds

available to satisfy Claims would be paid in the priority established in the Bankruptcy Code –

Secured Claims, Administrative Claims, Priority Claims, Priority Tax Claims, and General

Unsecured Claims.  Under a Chapter 7 liquidation, the Debtor believes that any recovery to

Allowed Claims in a Chapter 7 case would be less than that provided for under the Plan.  For the

reasons noted above, the Debtor has concluded that holders of Allowed Claims are more likely

90

than not to receive an amount under the Plan that is more than the amount such holder would receive under a Chapter 7 liquidation.

**B.**      <u>**Alternative Plan(s) of Reorganization**</u>

If the Plan is not confirmed, the Debtor or any other party-in-interest could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of assets, or a combination of both.

The Debtor's business could suffer from increased costs and further liquidity difficulties if remains a debtor-in-possession during a lengthy Chapter 11 process while trying to negotiate a plan. The Debtor believes that the Plan enables holders of Claims and Equity Interests to realize the greatest possible value under the circumstances and that, compared to any later alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

48051/0001-6285623v9

## X.    CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any of the alternatives above because it will result in the greatest recoveries to holders of Claims and Interests.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.

Consequently, the Debtor urges all holders of Claims entitled to vote to ACCEPT the Plan, and to evidence their acceptance by duly completing and returning their Ballots so that they are actually received by Debtor's counsel on or before 5:00 p.m. Eastern Time on July 12, 2010.

Dated: June 9, 2010

ZAYAT STABLES, LLC,

By: */s/ Ahmed Zayat*
    Name:  Ahmed Zayat

**Counsel:**

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By:  */s/ Michael D. Sirota*
    Michael D. Sirota
    Warren A. Usatine
    Court Plaza North
    25 Main Street
    P.O. Box 800
    Hackensack, NJ 07602-0800
    (201) 489-3000
    (201) 489-1536 (Fax)

    Attorneys for Zayat Stables, LLC

48051/0001-6285623v9